**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ALLIED HOME MORTGAGE CORPORATION and JAMES C. HODGE, <br><br> Plaintiffs, <br><br> vs. <br><br> SHAUN DONOVAN, Secretary, United States Department of Housing and Urban Development, and the United States Department of Housing and Urban Development <br><br> Defendants. | CIVIL ACTION NO. H-11-3864 |

**THE GOVERNMENT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

KENNETH MAGIDSON
UNITED STATES ATTORNEY

ERNEST GARCIA
Assistant United States Attorney
Southern District of Texas
919 Milam Street, Suite 1500
P.O. Box 61129
Houston, Texas 77208
Telephone:  (713) 567-9510
Facsimile:  (713) 718-3303
Attorneys for the United States of America

JAIMIE L. NAWADAY
PIERRE G. ARMAND
Special Assistant United States Attorneys
  - Of Counsel -

## TABLE OF CONTENTS

Table of Contents ................................................................................................... i

Table of Authorities .......................................................................................... ii-iv

Preliminary Statement ..............................................................................................1

Factual Background ...................................................................................................3

    A.    The FHA Mortgage Insurance Program .........................................................3

    B.    The Roles of Allied Capital and Allied Corporation in the FHA Program ...........7

    C.    Plaintiffs' Violation of FHA Program Requirements

        1.    Plaintiffs' Continuing Operation of Shadow Branches ..........................8
        2.    Plaintiffs' Continuing Prohibited Branch Operations ................................9
        3.    Plaintiffs' Continuing Disregard for Quality Control ............................11
        4.    Plaintiffs' Continuing Concealment of Sanctions and Convictions ........13
        5.    Continuing Deception of Third Parties ...................................................14

    D.    The Suspension and Debarment at Issue ................................................14

Argument ................................................................................................................15

    A.    Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits ................16

    B.    Plaintiffs Cannot Show Irreparable Harm ...............................................19

    C.    The Balance of the Equities Favors the Government ...........................................21

    D.    The Public Interest Does Not Favor Injunctive Relief .........................................22

Conclusion ..............................................................................................................23

## TABLE OF AUTHORITIES

**CASES**                                                                  Page(s)

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564
    (1972)...................................................................................................19

*Castellano v. Fragozo*, 352 F.3d 939
    (5th Cir. 2003)...........................................................................................16

*Cherokee Pump & Equipment, Inc. v. Aurora Pump*, 38 F.3d 246
    (5th Cir. 1994)...........................................................................................15

*Flory v. United States*, 138 F.3d 157
    (5th Cir.1998)............................................................................................21

*Forehand v. IRS*, 877 F. Supp. 592
    (M.D. Ala. 1995)........................................................................................19

*Frank's Livestock and Poultry Farm, Inc. v. United States*, 905 F.2d 1515
    (Fed. Cir. 1990).........................................................................................19

*Gonzales v. Freeman*, 334 F.2d 570
    (D.C. Cir. 1964).........................................................................................16

*Horne Brothers, Inc. v. Laird*, 463 F.2d 1268
    (D.C. Cir. 1972).........................................................................................16

*Kerr v. Lyford*, 171 F.3d 330
    (5th Cir.1999)............................................................................................16

*L. P. Steuart & Brothers v. Bowles*, 322 U.S. 398
    (1944).......................................................................................................16

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422
    (1982).......................................................................................................19

*Mazurek v. Armstrong*, 520 U.S. 968
    (1997).......................................................................................................15

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618
    (5th Cir. 1985)...........................................................................................15

*Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852
    (5th Cir.1979)............................................................................................21

*Park v. City of San Antonio*, No. 03-0491, 2006 WL 2519503
(W.D. Tex. Aug. 16, 2006) ..................................................................................18

*Siegel v. LePore*, 234 F.3d 1163
(5th Cir. 2002) ....................................................................................................15

*Simi Investment Co., Inc. v. Harris County, Tex.*, 236 F.3d 240
(5th Cir. 2000)....................................................................................................18

*State of Texas v. Seatrain International, S.A.*, 518 F.2d 175
(5th Cir. 1975).....................................................................................................15

*Talley v. Lane*, 13 F.3d 1031
(7th Cir. 1994).....................................................................................................19

*Towers at Sunnyvale, LLC v. Dallas Central Appraisal District*, No. 3:08-0735,
2009 WL 3029762 ...............................................................................................18

*Transco Security, Inc. of Ohio v. Freeman*, 639 F.2d 318
(6th Cir. 1981).....................................................................................................16

*United States v. Lucio*, No. 06-930, 2006 WL 1663756
(S.D. Tex. Jun. 13, 2006) ...................................................................................16

*Winter v. NRDC, Inc.*, 555 U.S. 7
(2008).................................................................................................................21

**RULES and STATUTES**

2 C.F.R. § 180.700 ...................................................................................................16

2 C.F.R. § 180.705(a)..................................................................................................7

2 C.F.R. § 180.800 ...................................................................................................16

24 C.F.R. § 24.105(a)................................................................................................16

24 C.F.R. § 25.2 .........................................................................................................6

24 C.F.R. § 25.5 .........................................................................................................6

24 C.F.R. § 25.9 .........................................................................................................7

24 C.F.R. § 25.10(a)....................................................................................................7

24 C.F.R. § 25.10(b) ..............................................................................................7, 19

24 C.F.R. § 202.3(a)..................................................................................................3, 4, 5

24 C.F.R. § 202.5 ...........................................................................................................5, 6

5 U.S.C. § 704........................................................................................................ passim

5 U.S.C. § 706 ..............................................................................................................16

12 U.S.C. § 1708...................................................................................................... passim

12 U.S.C. § 1709................................................................................................................3, 6

## PRELIMINARY STATEMENT

Defendant Shaun Donovan, in this capacity as Secretary of the United States Department of Housing and Urban Development ("HUD" or the "Government"), by its attorney, Kenneth Magidson, United States Attorney for the Southern District of Texas, respectfully submits this opposition to Plaintiffs' motion for a preliminary injunction.

This case is about Jim C. Hodge, his decade of concealed misconduct, and the risk he poses to the mortgage market and the public insurance fund. Hodge remains at the helm of both Allied Home Mortgage Capital Corporation ("Allied Capital") and Allied Home Mortgage ("Allied Corporation"); his two entities have the same ownership structure, the same headquarters, nearly all the same senior managers, the same quality control employees, and pose the same risk to the public. And while recognizing that HUD's suspension was based on the complaint filed by the United States Attorney's Office for the Southern District of New York (the "SDNY complaint"), Plaintiffs offer *no response* to the substance of the allegations of the SDNY complaint against Hodge and Allied Capital, but suggest that Allied Corporation should nevertheless be given a fresh start.

In arguing for new and improved Allied Corporation, Plaintiffs offer little more than allegations of improved technology and increased training, ignoring the fact that the controlling principals, not the technology, are responsible for the fraud alleged in the complaint. Indeed, just since the filing of the SDNY complaint, Hodge has repeatedly informed his employees that "the banks" have frozen his accounts, thereby preventing branch managers from withdrawing loan commissions from their accounts. Based on the information available to the SDNY at the time of filing its papers, that representation appears to be false. In short, far from showing that the

suspension should lift, Plaintiffs continue to justify HUD's suspension and cannot meet the standard for a preliminary injunction.

Plaintiffs cannot show likelihood of success of the merits because doing so would require them to show that HUD's actions were arbitrary and capricious, which, in turn, would require showing that HUD did not even have adequate evidence—a standard akin to *probable cause*—of either a serious violation or a history of violations of HUD requirements. Plaintiffs cannot do so as they do not even contest that Hodge has continued to commit violations of HUD requirements for the past decade through the present. Indeed, the strongest endorsement Plaintiffs offer of Hodge is their narrowly-crafted statement that he "has never been suspended nor debarred by HUD or any other government agency."

Even apart from their inability to show likelihood of success on the merits, Plaintiffs cannot show irreparable harm specifically as a result of the HUD suspension. HUD's suspension does not affect Allied Corporation's ability to engage in conventional lending; it simply bars the company from originating HUD-insured loans in order to protect the public insurance fund. Further, in an email dated November 3, 2011, Hodge told all employees that he has established a new relationship with an investor willing to purchase Allied Corporation's loans and that "[t]his new selling relationship allows us to get back in business." In any event, to the extent that Allied Corporation suffers harm, that harm befell them as a result of the filing SDNY complaint, and the SDNY will continue to litigate its complaint irrespective of the outcome of the HUD suspension.

The remaining factors in the preliminary injunction calculus all tip decidedly in favor of the Government. The balance of equities weighs against the Plaintiffs, who come into Court with unclean hands while seeking equitable relief. While the concealed misconduct by Hodge and his

2

companies have caused more than $834 million in insurance claims paid by HUD, and the

Governments faces an additional wave of defaults that could result in an additional $363 million,

Plaintiffs trivialize this harm by suggesting that they post bond in the amount of $1,000 should an

injunction issue.  Finally, the suspension of Plaintiffs is critical to protect the health of the public

insurance fund, and any resulting harm to Plaintiffs stems from their own actions and should not

be weighed as undue hardship.

For these reasons, the Government respectfully requests that Plaintiffs' motion for a

preliminary injunction be denied.

## FACTUAL BACKGROUND

### A. The FHA Mortgage Insurance Program

Pursuant to the National Housing Act of 1934, the FHA offers various mortgage insurance

programs.  *See* 12 U.S.C. § 1709.  Through these programs, FHA insures approved lenders

("mortgagees") against losses on mortgage loans made to buyers of single-family housing.  The

program helps low-income and moderate-income families become homeowners by lowering some

of the costs of their mortgage loans.  FHA mortgage insurance encourages lenders to make loans

to creditworthy borrowers who nevertheless might not meet conventional underwriting

requirements.  *See* 12 U.S.C. §§ 1708; 1709(a).

To obtain the Secretary's approval to participate in HUD's mortgage insurance program, a

mortgagee must submit an approval application containing certain documents and information

concerning the eligibility of the company and its owner(s) and officers to participate in the

3

program. 24 C.F.R. § 202.3(a).[1]  When determining whether to approve a mortgagee's

application, HUD must rely upon the documents and information in the application package.  The

Secretary approves a mortgagee by entering into an agreement with the mortgagee, signifying that

the mortgagee has agreed to comply at all times with applicable program requirements, including

all eligibility and compliance requirements.  24 C.F.R. § 202.3(a).

 A mortgagee that seeks to originate loans from branch offices must first obtain approval by

submitting a form (HUD Form 92001-B) to HUD containing basic information about the branch, a

general certification that the branch "meets all HUD/FHA requirements," and a specific

certification that the lender "will pay all operating costs of the branch office . . . ."  HUD

Handbook 4060.1 REV-2, paragraphs 5-7.  The purpose of the requirement is to prevent

mortgagees from operating "net branches" or franchise operations subject to little oversight or

control.  After submitting the certification, the branch receives a unique HUD ID that permits it to

originate FHA loans and permits HUD to monitor the default rate of loans originated from that

branch.  *Id.*  If a branch's default rate exceeds 200% of the regional average for HUD approved

lenders, HUD issues a "Credit Watch Termination" that revokes the lender's approval to originate

FHA loans at that branch and suspends approval of any new branches within a specified area.  *See*

24 C.F.R. § 202.3.  This area, roughly the size of a state, is formally referred to as a "HUD field

office jurisdiction."

 Approved mortgagees must also submit annual certification forms attesting to their

compliance with HUD eligibility and other requirements, as well as comply with other reporting

---

[1] *See* HUD Handbook 4060.1, REV-2, Chapters 1, 2 and 3, *esp.* § 3-2(A) (*available at* http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips /handbooks/hsgh/4060.1).

requirements.  HUD Handbook 4060.1 REV-2, paragraph 4-2.[2] The annual certifications contain

four distinct representations, set forth below:

> I certify that none of the principals, owners, officers, directors, and/or employees of
> the above-named lender is currently involved in a proceeding and/or investigation
> that could result, or has resulted in a criminal conviction, debarment, limited denial
> of participation, suspension, or civil money penalty by a federal, state, or local
> government.
>
> I certify that the above named lender has not been refused a license and has not
> been sanctioned by any state(s) in which it originates and/or services HUD-FHA
> insured loans.
>
> I know, or am in the position to know, whether the operations of the above named
> lender conform to HUD-FHA regulations, handbooks, and policies.
>
> I certify that to the best of my knowledge, the above named lender conforms to all
> HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the
> above named lender is fully responsible for all actions of its employees including
> those of its HUD-FHA approved branch offices.
> *Id.*

HUD must rely upon mortgagees' self-reporting and self-certification, as HUD cannot

independently obtain necessary information about the activities of all of its thousands of

mortgagees, their owners and operators, and employees.

HUD's eligibility requirements for mortgagees specifically provide that a lender and its

officers, directors, and employees are ineligible for the Program if any of them has been convicted

of a criminal offense that reflects upon the mortgagee's responsibility, integrity, or ability to

participate in the FHA mortgage insurance program. 12 U.S.C. § 1708(d); 24 C.F.R. § 202.5.  In

furtherance of this restriction, HUD requires applicants to disclose certain information to HUD

---

[2] HUD also requires prompt reporting of certain changes impacting eligibility requirements
or other conditions of FHA approval, such as the imposition of state sanctions or other
administrative action.  (HUD Mortgage Letter 09-31).

concerning federal and state criminal actions against the entity or its owners and operators.

Mortgagees are also required to comply with all state licensing requirements in conjunction with their HUD approval. HUD Handbook 4060.1, REV-2, paragraph 2-3. A lender that has been subject to a sanction or action against its state license "must submit documentation concerning the action." *Id.* To further ensure that mortgagees are properly screening and supervising the employees they hire, as of 2006, HUD has declared mortgagees "ineligible" for approval by HUD if, among other things, any officer, partner, director, principal, or employee of the lender is "[u]nder indictment for, or has been convicted of, an offense that reflects adversely upon the applicant's integrity, competence, or fitness to meet the responsibilities of an approved mortgagee [or] [s]ubject to unresolved findings contained in a HUD or other governmental audit, investigation . . ." 4060.1, REV-2, paragraph 2-10. *See also* 24 C.F.R. 202.5.

Finally, to maintain their HUD approval, mortgagees must implement a quality control program, which, among other things, ensures compliance with certain key HUD requirements. *See* HUD Handbook 4060.1 REV-2, paragraphs 7-1--7-3. As part of its quality control program, a mortgagee must (a) conduct an on-site audit of all branch offices within 90 days of opening and annually thereafter; (b) review 10% of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (c) review all early payment defaults (*i.e.*, those that default within the first six months). *Id.* Review of early payment defaults is particularly important because such defaults are indicative of mortgage fraud.

Congress established the Mortgagee Review Board ("MRB") within HUD to review the activities of the mortgagees that originate FHA-insured loans and to initiate administrative actions against mortgagees that violate FHA requirements. *See* 12 U.S.C. §§ 1708(c); 1709(b)(1); 24

6

C.F.R. § 25.2. The MRB is authorized to impose administrative sanctions, including immediate withdrawal of a mortgagee's FHA approval. 12 U.S.C. § 1708(c)(3)(A)-(D); 24 C.F.R. § 25.5. The MRB is both authorized and required to take administrative actions against approved mortgagees "[w]hen any report, audit, investigation or other information before the Board discloses that a basis for an administrative action against a mortgagee exists." 12 U.S.C. §§ 1708(c)(3). Finally, the MRB may immediately suspend or debar a mortgagee if the Board determines that there is adequate evidence that (i) the mortgagee has committed a serious violation or has a history of violations; and (ii) immediate action is in the public interest or the best interest of the Department. 12 U.S.C. § 1708(c)(3)(D); 24 C.F.R. §§ 25.5(e)(2)(i). In determining the adequacy of the evidence of the suspension, the MRB is to consider "how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result." 2 CFR 180.705(a).

When the MRB takes immediate action to withdraw a mortgagee's approval, HUD must promptly inform the mortgagee of the withdrawal action taken, including the nature, duration, and reasons for the withdrawal, and the mortgagee's right to request, within 30 days, a hearing before an administrative law judge. 12 U.S.C. § 1708(c)(4)(B); 24 C.F.R. §§ 25.9 & 25.10(a). A hearing must be held within 30 days of the mortgagee's request for a hearing, unless the mortgagee requests an extension of time. 12 U.S.C. § 1708(c)(4)(B); 24 C.F.R. § 25.10(b). After exhausting administrative remedies, the mortgagee can appeal the final agency action in accordance with the Administrative Procedures Act, 5 U.S.C. § 704.

7

**B. The Roles of Allied Capital and Allied Corporation in the FHA Program**

Allied Capital participated in the FHA mortgage insurance program as a loan correspondent, meaning that it was able to originate FHA loans out of HUD-approved branches, but was required to send them to a HUD-approved direct endorsement lender, such as Allied Corporation, for underwriting approval prior to loan closing and securing an insurance endorsement from HUD.[3] The loan correspondent program was discontinued nationwide by the end of 2010. In late 2010, nearly all of Allied Capital's branches were closed and immediately reopened as branches of Allied Corporation. Declaration of Jennifer Lake ("Lake Decl.") ¶ 6(e). Both companies have the same headquarters, ownership structure, management, and quality control. *Id.*

**C. Plaintiffs' Violation of FHA Program Requirements**

    1.  <u>Plaintiffs' Continuing Operation of Shadow Branches</u>

As set forth in detail in the Government's complaint, Hodge and his companies repeatedly and egregiously violated HUD requirements for the last decade. Among other things, Allied originated thousands of FHA loans out of branches that were not HUD approved by "marrying" an unapproved branch to an approved branch and entering the HUD ID of an approved branch on all loans originated from the "shadow" branch. Allied has engaged in this practice, and was on notice that it violated HUD requirements, since at least 2000, and Allied Home Mortgage appears to continue this practice today. *See* Lake Decl. ¶ 6(a)-(e); Declaration of Aaron Horenstein ("Horenstein Decl.") ¶¶ 6-11. Shadow branches pose a risk to HUD precisely because they

---

[3] *See* Lender Detail Report on Allied Capital and Allied Corporation (available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/lender /nw_home).

operate under the regulatory radar; if they are not disclosed to HUD, they cannot be audited by HUD.

Allied Capital continued to originate FHA loans out of shadow branches even after HUD expressly *terminated* its origination authority within the Greensboro, North Carolina HUD field office jurisdiction in 2006, thereby barring Allied Capital from originating FHA loans from the branch that prompted the termination as well as from newly-opened branches throughout North Carolina. *See* Lake Decl. ¶ 6(b)-(d). Allied Capital simply ignored the termination and continued to open new branches in that area, approximately one or two per month, and nearly all of its new branches secretly originated FHA loans. *Id.* Several senior managers raised their concerns about Allied's practice with Hodge, but Hodge directed that the practice continue. *Id.* ¶6(c). In total, Allied originated FHA loans out of more than *seventy* shadow branches just in North Carolina without HUD's knowledge or approval. *Id.* ¶ 6(d). Nationwide, the operation of shadow branches continued at least through 2010. *Id.* ¶ 6(c).

Although Plaintiffs now emphasize that "all of Allied Corporation's 152 branches are FHA licensed" (Pl. Br. at 3), the evidence shows otherwise. A series of internet searches in Massachusetts, for example, reveals that both Allied Capital and Allied Corporation have offered FHA-insured loans from at least six (6) branches in that state. *See* Horenstein Decl. ¶ 41. Allied Corporation has never had a HUD-approved branch in the Commonwealth of Massachusetts, and Allied Capital has not had a HUD-approved branch in the Commonwealth of Massachusetts since March 2011, when the HUD approval of a branch in Beverly, Massachusetts, was terminated. *See* Horenstein Decl. ¶¶ 5-6. Nevertheless, an Allied Capital branch is currently operating a website with postings as recently as October 2011. *Id.* ¶¶ 8-12. Indeed, the branch manager is announcing

9

on the website that he is currently hiring employees. *Id.* ¶ 11. Moreover, the Nationwide Mortgage Licensing System & Registry ("NMLS") lists the branch manager as operating both Allied Capital and Allied Corporation branches. *Id.* ¶ 9. This listing further confirms that Plaintiffs' alleged "purchase" or "migration" of branches from Allied Capital to Allied Corporation was nothing more than a name change. *Id.*

      2.  <u>Plaintiffs' Continuing Prohibited Branch Operations</u>

Allied Capital was equally deceptive about its practices at approved branches. As the SDNY's complaint alleges, Allied Capital—and now Allied Corporation—have submitted knowingly false certifications when it sought approval for each of its branch offices and represented that it "paid the operating costs of the branch office." *See* Lake Decl. ¶ 7(a). Despite having been referred to the Mortgage Review Board in 2001 and 2009 for its prohibited branch practices, Allied Corporation continues the same practice. *Id.* ¶ 7(b)-(h).

Following its first negative audit in early 2001, when HUD notified Allied Capital that it intended to seek civil penalties, Allied Capital issued an update to its operating manual to all branch managers, referencing HUD requirements and stating that "[i]t is important that everyone understand that . . . [Allied] pays all of the operating expenses for each branch . . . [Allied] is also the lessee of the space occupied by the [Allied] branches." *Id.* ¶ 7(c); Exhibit 1. Shortly thereafter, Allied Capital prepared an updated chapter on "Examination/Audit Procedure" to its manual, dated August 29, 2001, which instructs employees to respond to government auditors as follows: "Frequently, examiners/ auditors view us as a franchise. WE ARE NOT A FRANCHISE . . . Allied pays all the bills incurred by the branch. **Both of these statements are true and that is**

10

the only way those questions are to be answered, *no deviations!* (bold and italics in original.)
*Id.* ¶ 7(c); Exhibit 2.

Although Allied Capital entered into a settlement with HUD in 2003 promising to comply
with HUD requirements, its prohibited branch operations continued unabated.  To highlight just
one example from the Government's complaint, Allied Capital required an Ohio branch manager
to reimburse the company for settling a lawsuit involving conduct alleged at her branch, adding
that there was never a judgment "that was not assessed against branch revenue. . . . [I]f the case
goes to trial and a judgment is entered . . . it is considered a branch operating expense." *Id.* ¶ 7(d).

In 2008 and 2009, HUD conducted a second audit of Allied Capital and again found it was
engaging in prohibited branch operations.  Specifically, HUD found that:

> [n]one of the office space lease agreements for the five branches reviewed were in Allied's
> name.  Instead, the branch managers personally entered into and signed the lease
> agreements.  Four of the five branch managers had signed month-to-month subleases with
> Allied . . . However, ultimate responsibility for the lease payments continued to rest with
> the branch manager if Allied canceled the sublease . . . By not directly entering into leases,
> Allied apparently attempted to main a separation between itself and its branch offices
> which was inconsistent with the close supervisory control and oversight of its branches
> required by HUD  (citing HUD Mortgagee Approval Handbook 4060.1, REV-2,
> paragraphs 2-9 A and D).
> *Id.* ¶ 7(e).

After the audit report was issued, Stell sent an email to a former employee, commenting:
"I had [another senior manager] sign the 'add a branch' form for years for HUD as I knew this
would eventually happen.  It required that you swear the branches meet and will continue to meet
HUD's regulations.  Jim [Hodge] has to be the biggest target personally for his disregard for the
regulations.  Serves him right never listening and thinking he didn't have to play by the rules." *Id.*
¶ 7(f).  In responding to HUD's findings, however, Allied Capital represented that it was

11

"confident [that] with the new operations changes as of today we are 100% compliant and will maintain that level on an ongoing basis." *Id.* ¶ 7(g).

Again, the promise of compliance was false. When the "migration" from Allied Capital to Allied Corporation occurred, Stell, on behalf of Allied Corporation, sent the branch managers new subleases to execute that reflected the new company name, but were otherwise exactly the same and still required the branch managers to assume the role of financially responsible party. *Id.* ¶ 7(h); Exhibit 3. In January 2011, when an Iowa branch manager of Allied Corporation was informed that her branch would be closed that day, she asked the corporate office what it planned to do "about these leases" or whether she would be "left holding the bag?" In response, Hodge emailed, "Allied corp policy is only a month to month lease we have no control over what you sign or do." *Id.* ¶ 7(h); Exhibit 4.

      3.  <u>Plaintiffs' Continuing Disregard for Quality Control</u>

Hodge and his companies also failed to maintain the quality control required of mortgagees. On this issue as well, Allied Capital faced two HUD audits a few years apart and both audits resulted in similarly negative findings. *Id.* ¶ 8(a). For example, in 2004, a HUD audit of Allied Capital's quality control department concluded that it "was not doing [early payment default] reviews" and found that the only two quality control reports produced to HUD "contain[ed] no information of use." *Id.* When HUD conducted a second audit of Allied Capital in 2007, it again found that the company "has not implemented a Quality Control (QC) Plan and is not conducting Quality Control reviews in accordance with HUD criteria." *Id.*

One reason Allied Capital failed to conduct quality control reviews was that Hodge failed to hire adequate and qualified quality control auditors. *Id.* ¶ 8(b)-(c). Between 2004 and 2008,

Allied Capital was originating loans out of several hundred branches, yet had a quality control staff of just *two* in its corporate office to conduct quality control reviews. *Id.* Hodge did, however, maintain an additional 2-5 members of its quality control department in St. Croix, in the U.S. Virgin Islands. *Id* ¶ 8(c). The offshore quality control employees, however, according to Allied Capital's quality control manager, did not know what HUD was, or even what a mortgage was. *Id.*

Despite their lack of qualifications, the St. Croix-based employees were hired by Hodge to work for another Hodge-owned entity called "Allquest Mortgage Capital Corporation," an economic development corporation. *Id.* As an economic development corporation, Allquest was entitled to receive a 90% reduction in income taxes. In exchange for providing nominal quality control services to Allied Capital, Allquest received millions of dollars in management fees that Allied Capital then deducted as business expenses. *Id.*

Even though Hodge was well aware of the deficiencies in the quality control department, he chose simply to deceive auditors about its deficiencies rather than make improvements. In early 2009, when Allied Capital was asked to provide up-to-date quality control reports to HUD and could not, the quality control employees, at Hodge's direction, created false reports that looked complete by indicating that verifications of income, employment, and deposit had been conducted. *Id.* ¶ 8(e)-(g). The resulting fraudulent reports were then submitted to HUD and other third parties. *Id.*

4. <u>Plaintiffs' Continuing Concealment of Sanctions and Convictions</u>

Hodge and his companies have also deceived HUD and violated its requirements by concealing numerous sanctions and employee convictions in recent years. *Id.* ¶ 9(a)-(b). Again,

13

to highlight just a few examples from the Government's complaint, although Allied Capital submitted annual certifications in 2006 and 2007 representing that it had a clean record in all states in which it operated, it had in fact been sanctioned by states in both of those years. *Id.* ¶ 9(a). Additionally, while representing to HUD in 2006 and 2007 that none of its employees had convictions, it disclosed to a state regulator in 2006 the names of fifteen employees with felony convictions that it had hired in just the 12-month reporting cycle. *Id.* ¶ 9(b). Moreover, even that list was incomplete. One of Allied Capital's longtime state managers—an individual responsible for regulatory compliance—was a convicted felon who had supervisory responsibility for more than fifty branches and remained with Allied Capital through at least 2009. *Id.* According to one former employee of Allied Capital's human resources department, even when she declined to hire a convicted felon, Hodge frequently overruled her decision and directed that the individual be hired. *Id.*

    . 5.  <u>Continuing Deception of Third Parties</u>

      Finally, the target of Hodge's deception was not limited to HUD. For instance, when Hodge sought to save money on state-required surety bonds, he directed employees to provide states with bonds from a Hodge-owned entity in the Cook Islands, Mercantile Insurance & Fidelity Company. *Id.* ¶ 10. The purpose of such bonds is to assure the recovery of penalties imposed by state regulators for non-compliance with regulations. Although Mercantile was not licensed to issue bonds in any state, the licensing department was "told [by Hodge] to write bonds in all states until 'something happened'." *Id.* Hodge appears to have continued issuing Mercantile bonds in purported satisfaction of state licensing requirements as recently as late 2010. *Id.*

14

**D.  The Suspension and Debarment at Issue**

On November 1, 2011, the SDNY filed a civil fraud action against Allied Capital, Allied Corporation, Hodge, and Jeanne Stell, Executive Vice President of Allied Capital.  The same day, HUD issued a notice immediately suspending Allied Corporation and debarring Hodge from the FHA mortgage insurance program.  Pl. Compl. Ex. 1.  The Notice sets forth the basis for HUD's action, including the acts described above, and provides that Allied Corporation and Hodge may appeal HUD's action by submitting a request for a hearing within thirty days.  *Id.*  This action followed.

## ARGUMENT

Plaintiffs cannot demonstrate an entitlement to a preliminary injunction.  A preliminary injunction is an "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (citation omitted).  Injunctive relief should be granted only if the moving party has clearly carried the burden of persuasion on all four elements.  *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 621-22 (5th Cir. 1985); *Siegel v. LePore*, 234 F.3d 1163, 1176 (5th Cir. 2002). ("In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites.").  Those four elements include: (i) a substantial likelihood of success on the merits; (ii) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (iii) that the threatened injury outweighs the threatened harm to defendants; and (iv) that granting the injunctive relief will not be a disservice to the public interest.  *Cherokee Pump & Equipment, Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994)

(citations omitted).  The decision to grant injunctive relief is to be treated as the exception rather

than the rule.  *Id.*, 234 F.3d at 1180(quoting *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th

Cir. 1975)).

### A.     Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits

Plaintiffs cannot demonstrate a substantial likelihood of success on the merits concerning

their challenge to HUD's determination debarring Hodge and suspending Allied Corporation from

its mortgage insurance program.  To succeed on the merits, Plaintiffs would have to show that

HUD's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law."  5 U.S.C. § 706.  In order to show that HUD's action was arbitrary or capricious, in

turn, Plaintiffs would have to demonstrate that HUD lacked "adequate evidence" that the target

committed either a serious or repeated violations and that action was necessary to protect the

public interest.  *See* 2 C.F.R. Part 180.700; 180.800.  HUD regulations define "adequate evidence"

as "information sufficient to support the reasonable belief that a particular act or omission has

occurred."  24 C.F.R. 24.105(a).  Courts have held this standard to be analogous to the standard

required to establish probable cause prior to the issuance of an arrest or search warrant.  *See*

*Transco Security, Inc. of Ohio v. Freeman*, 639 F.2d 318, 324 (6th Cir. 1981); *Horne Bros. Inc. v.*

*Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972).[4]  In short, the "adequate evidence" standard is not

---

[4] The threshold for a finding of "probable cause" to justify a search or arrest is low.  *See*
*United States v. Lucio*, No. 06-930, 2006 WL 1663756, at *2 (S.D. Tex. Jun. 13, 2006) (" A
magistrate may find probable cause if the government shows 'evidence sufficient to cause a person
of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's
guilt."); *Kerr v. Lyford*, 171 F.3d 330, 342 n. 16 (5th Cir.1999), *abrogated* on other grounds,
Castellano v. Fragozo, 352 F.3d 939 (5th Cir. 2003) (noting that probable cause existed to arrest a
suspect who merely had fled from police in a high crime area and reached into his pocket, which
"exemplifies how low the threshold for a finding of probable cause is").

intended to be a high hurdle because suspension and debarment are not penalties, but ways for the Government to carry out its statutory obligations to protect the public. *See L. P. Steuart & Bros. v. Bowles*, 322 U.S. 398 (1944); *Gonzales v. Freeman*, 334 F. 2d 570 (D.C. Cir. 1964).

Plaintiffs cannot come close to showing that HUD lacked probable cause to believe that Plaintiffs committed serious or repeated violations. As set forth above, Hodge and his companies have for years operated shadow branches, refused to pay branch operating costs, lied to HUD about compliance, operated a sham quality control program in St. Croix, concealed state sanctions and employee convictions, and violated state licensing requirements. Plaintiffs do not appear to contest the substance of these allegations,[5] nor do they contend that such conduct does not constitute serious violations of HUD requirements.

Instead, in support of Hodge, all Plaintiffs manage to say is that he "has never been suspended nor debarred by HUD or any other government agency." Pl. Br. 3. Such a carefully-crafted statement is far from a ringing endorsement, particularly given that Hodge has been in the mortgage business for the past twenty years. Moreover, the evidence indicates that Hodge has worked diligently over the years to conceal his misconduct from HUD, the only agency that could suspend or debar Hodge from originating FHA loans.[6]

Given Hodge's control over both Allied Capital and Allied Corporation, he poses the same

---

[5] The *only* challenges Plaintiffs advance on the Government's civil fraud action, on which the HUD suspension is based, are an irrelevant *ad hominem* attack on the relator who filed the original *qui tam* in which the Government intervened after conducting its own independent and extensive investigation, and their contention that Allied Corporation is not the mere continuation of Allied Capital.

[6] In any event, prior to his entering the mortgage industry, Hodge faced a cease-and-desist order by the Office of Thrift Supervision based on his management of Mercantile Savings Bank, barring him from "participating in any manner in the conduct of the affairs of any insured savings association . . ." Lake Decl. ¶ 13; Exhibit 13.

17

risk to the public insurance fund through Allied Corporation as he does through Allied Capital. Indeed, Hodge has previously stated to employees that he creates and maintains numerous shell entities because, if forced to shut one down, he can "pull another one off the shelf" and continue his business as usual. Lake Decl. ¶ 14. That is precisely what Hodge is attempting to do by this motion. In short, Allied Corporation, with its identical management, ownership structure, branch operations, and quality control, is simply a continuation of Hodge's business as usual. *Id.* ¶ 6(e). Plaintiffs' vague references to Allied Corporation's "strengthened internal monitoring," increased compliance staff, and increased training (Pl. Br. 2) are therefore neither credible nor sufficient to vindicate the company. [7] In short, there is more than adequate evidence to support HUD's immediate actions against the Plaintiffs.

Finally, the immediate action taken by HUD does not violate Plaintiffs' rights to substantive and procedural due process under the Fifth Amendment of the United States Constitution. *See* Pl. Br. at 9. To establish a substantive due process violation, Plaintiffs must prove: (1) "a constitutionally protected interest in . . . property"; and (2) "the government deprived [them] of that interest capriciously and arbitrarily." *Towers at Sunnyvale, LLC v. Dallas Cent. Appraisal Dist.* No. 3:08-0735, 2009 WL 3029762, at *3 (N.D. Tex. Sept. 23, 2009 (citing *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 249 (5th Cir. 2000)). To establish a

---

[7] Although Plaintiffs suggest that Allied Corporation is a new and improved company with impressive default rates (Pl. Br. 3), they neglect to point out that nearly all of Allied Corporation's branches received approval (and attendant HUD IDs) between November 2010 and March 2011. *Id.*; Exhibit A. HUD's default rate data extends only from the time of approval, so Plaintiffs essentially boast that fewer of the loans they originated in the last six months to a year have gone into default. This does not mean that loan quality has suddenly and drastically improved. To the contrary, the migration of branches into Allied Corporation resulted in no substantive change to loan origination practices (*Id.*) Thus, it is likely only a matter of time until Allied Corporation's default rates climb back to the consistently high rates before the "migration."

18

procedural due process violation, Plaintiffs must demonstrate: "(1) a deprivation of a protected property interest; and (2) an absence of due process." *Park v. City of San Antonio*, No. 03-0491, 2006 WL 2519503, at *10 (W.D. Tex. Aug. 16, 2006) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). Plaintiffs cannot satisfy either standard.

First, Plaintiffs cannot show a constitutionally protected property interest because they were never legitimately eligible to participate in the FHA program, *see Bd. of Regents*, 408 U.S. 564, 577 (1972) (cognizable property interest must rest upon "legitimate claim of entitlement"), and because private citizens are not constitutionally "entitled to engage in government programs." *Forehand v. IRS*, 877 F. Supp. 592, 595 (M.D. Ala. 1995); *Talley v. Lane*, 13 F.3d 1031 (7th Cir. 1994) (no protected interest in federal program); *Frank's Livestock and Poultry Farm, Inc. v. United States*, 905 F.2d 1515 (Fed. Cir. 1990) (same). Second, Plaintiffs fail to show that the Government acted capriciously or arbitrarily because, as explained above, HUD's decision to suspend Plaintiffs was based on adequate evidence of a decade of fraudulent activity that was still ongoing. Finally, Plaintiffs cannot prove an absence of due process, because HUD afforded them all of the process they were due under the statutory and regulatory provisions of the FHA program, which under these circumstances, is a right to a hearing before an administrative law judge within 30 days. *See* 12 U.S.C. § 1708(c); 24 C.F.R. § 25.10.

## B.    Plaintiffs Cannot Show Irreparable Harm

Plaintiffs have failed to demonstrate that they face irreparable harm unless the suspension is lifted. As an initial matter, HUD's suspension does not prevent Allied Corporation from continuing its origination of non-FHA-insured ("conventional") mortgage loans. Further, on November 3, 2011, Hodge emailed his employees that:

19

> [o]ne of our Warehouse Banks has put us in touch with another Lender who is willing to
> partner with us and purchase our loans . . . That provides us a way to get the loans
> purchased off our warehouse line and gives us a new avenue for loan origination . . . This
> new selling relationship allows us to get back in business.
> *Id.*; Ex. 6.[8]

In short, according to Hodge, he has already taken steps to mitigate the harm faced by his

company.  And given the ready availability of an administrative hearing within 30 days of any

administrative appeal, Plaintiffs will not suffer irreparable harm before a decision on the merits of

the suspension can be rendered.

In any event, whatever harm Plaintiffs face will likely occur irrespective of whether the

HUD suspension is lifted.  In an email just one day earlier, on November 2, 2011, Hodge informed

all employees of the bleak prospects for the company, citing "the article concerning the US

attorneys suing Allied" and commenting that "[s]ubsequent to that article being published," a

series of events occurred "that made circumstances even more challenging[,]" including that

warehouse lenders froze Allied Corporation's credit, certain investors ceased purchasing the

company's loans, Fannie Mae disabled its online accounts, and "[t]he Banks" have "frozen [their]

accounts." Lake Decl. ¶ 12 Ex. 5.  The outcome of the HUD administrative action will not

automatically restore any of these severed relationships, and the SDNY complaint, which Hodge

cites as the initiating force in his troubles, will continue regardless of the outcome of this

---

[8] Hodge also notes that if Allied Corporation obtains injunctive relief, such a result should
"free up our bank accounts (that are currently frozen)." *Id.*  In their motion papers, Plaintiffs make
no mention of frozen bank accounts but instead mention only that warehouse lenders and
purchasers have already begun distancing themselves from Allied Corporation. Based on the
SDNY investigation, Wells Fargo holds nearly all of the accounts of Allied Capital and Allied
Corporation, yet Wells Fargo is unaware of any such action.  *See* Lake Decl. ¶ 12.  Further, since
filing its complaint, the SDNY has received numerous calls from Allied Corporation branch
managers reporting that they were unable to withdraw their previously-earned loan commissions
from their accounts and were informed by the corporate office that the "Department of Justice"
froze their accounts. *Id.*  The Department of Justice has taken no such action at this time.

proceeding. Plaintiffs therefore do not and cannot show that a lifting of the suspension would have any impact on third parties who have distanced themselves from Hodge.

### C.     The Balance of the Equities Favors the Government

"[T]he balance of equities and consideration of the public interest ... are pertinent in assessing the propriety of any injunctive relief . . ." *Winter v. NRDC, Inc.,* 555 U.S. 7, 14 (2008). Here, the balance of equities in this case clearly favors the Government.

Because Plaintiffs willfully flouted the HUD requirements for years, they come into Court with unclean hands, a determinative fact in the balance of equities. *See Flory v. United States,* 138 F.3d 157, 160 (5th Cir.1998) ("[H]e who comes into equity must come with clean hands."); *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979) (the unclean hands bar applies when the plaintiff has engaged in wrongful acts that "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.").     Hodge has wrongfully benefited for years by deceiving HUD to remain in the FHA mortgage insurance program, profiting from FHA loans while failing to comply with HUD requirements.  Any harm that Plaintiffs now suffer as a result of their exclusion from a program in which they were never legitimately entitled to participate should therefore not be given weight in the Court's analysis.  The harm that Plaintiffs claim to suffer is merely a result of their willful violation of the requirements for participation in HUD's loan insurance program.

The Government and the public, on the other hand, will face significant harm if HUD is forced to disregard its mortgagee eligibility requirements and related duties to protect the public insurance fund and potential borrowers from foreclosure.  The Government as well as the public have a strong interest both in government oversight of mortgage lenders, generally, and in

21

ensuring that the individual entities that HUD entrusts to originate government-backed mortgage loans are trustworthy business partners and are able to originate mortgage loans that conform to HUD's requirements. There is a strong interest in the prompt termination of lenders who threaten the FHA insurance program because HUD is responsible for protecting the overall health of the FHA insurance program, so that the benefits of that program will remain available to home buyers in the future. Enjoining HUD from removing an ineligible, noncompliant lender would weaken HUD's oversight power, render meaningless HUD's eligibility rules, jeopardize the FHA insurance program and the borrowers who rely upon it, and weaken public confidence in the FHA insurance program and expose prospective borrowers to a risk of foreclosure.

### D.  The Public Interest Does Not Favor Injunctive Relief

Plaintiffs cannot demonstrate that the public interest would be served by an injunction preventing HUD from terminating its suspension and debarment. Rather, such an injunction would be adverse to the public interest because, as set forth above, it would force HUD to violate its requirements, and would favor the self-interested pleas of a principal and company that have flouted HUD requirements and concealed misconduct for a decade, thereby endangering the borrowing public and the FHA fund.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied and their Complaint should be dismissed.

22

Dated:  November 7, 2011
           Houston, Texas

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney for the
Southern District of Texas

By:        /s/ Ernest C. Garcia
         Assistant United States Attorney
         Texas Bar No. 07632400
         Southern District Bar No. 8988
         P.O. Box 61129
         Houston, Texas 77208
         State Bar No. 14202000
         Telephone:  (713) 567-9510
         Fax: (713) 718-3407
         Email: ernest.garcia@usdoj.gov

By:        /s/ Jaimie L. Nawaday
         Jaimie L. Nawaday
         Pierre G. Armand
         Special Assistant United States Attorneys
         86 Chambers Street, 3rd Floor
         New York, New York 10007
         Telephone:  (212) 637-2528
         Fax: (212) 637-2750
         Email: jaimie.nawaday@usdoj.gov
         Email: pierre.armand@usdoj.gov

23

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above instrument was electronically filed with the United States District Clerk for the Southern District of Texas and faxed to Plaintiffs' attorney identified below on this 7th day of November, 2011.

A. Kent Altsuler                     via fax to 713-892-4800
2800 Post Oak Blvd.
61st Floor
Houston, Texas 77056

Counsel for Allied Home Mortgage Corp.
and James C. Hodge

/s/ *Ernest C. Garcia*
Ernest C. Garcia
Assistant United States Attorney