IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIED HOME MORTGAGE | § | |
| CORPORATION and JAMES C. HODGE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION H-11-3864 |
| | § | |
| SHAUN DONOVAN, Secretary, | § | |
| United States Department of | § | |
| Housing and Urban Development, | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOUSING AND URBAN DEVELOPMENT, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION**

Pending before the Court in the above referenced cause for declaratory and injunctive relief is Plaintiffs Allied Home Mortgage Corporation ("Corp.") and James C. Hodge's ("Hodge's") motion for a temporary restraining order and expedited preliminary injunction (instrument #2), seeking to enjoin the suspensions of Corp.'s approval to originate and underwrite FHA-insured mortgage loans and Hodge's right to participate in any FHA-insured lending by the Mortgagee Review Board ("the Board") of the United States Department of Housing and Urban Development ("HUD" or "the government"), effective November 1, 2011 (Exs. 1 and 2).[1]  The motion was first heard on November 3, 2011, with Assistant United States Attorney from the Southern District of New York, Jaimie

---

[1] The Board is authorized to issue such suspensions by 12 U.S.C. § 1708(3)(C) and (4)(B).

-1-

Nawaday, participating by telephone.  Because the Court concluded that it needed additional information and evidence, the Court converted the motion to one for a preliminary injunction and set an evidentiary hearing, which took place on November 8, 2011, with counsel for all parties participating in the courtroom.[2]

Plaintiffs' instant suit seeks a declaration that HUD's suspension of Allied Home Mortgage Corporation's origination and underwriting approval and suspension of Hodge from participation in any FHA-insured lending was arbitrary and capricious and effected without due process of law in violation of the Fifth Amendment. They request permanent injunctive relief in the setting aside or invalidation of the suspensions.

Corp. is a Texas corporation with its principal place of business in Houston, Texas.  Hodge is its Chief Executive Officer ("CEO") and a citizen of Texas.

Federal Rule of Civil Procedure 52(a) requires a court reviewing an application for preliminary injunctive relief to "set forth the findings of fact and conclusions of law which constitute the grounds of the action."

## Relevant Law

When reviewing an administrative agency's action under the

---

[2] At the hearing, the Court deferred reviewing Defendants' expedited motion to transfer the venue (#12) of this case to New York, where the earlier filed, related *qui tam* action is pending, as the government has not yet served Corp. and Hodge in that action.

Administrative Procedure Act ("APA"),[3] the court may set aside that ruling "only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Sun Towers, Inc. v. Schweiker*, 694 F.2d 1036, 1038 (5th Cir. 1983); 5 U.S.C. § 706 ("[T]he reviewing court [decides] all relevant questions of law."). Therefore an agency's determinations or questions of law are reviewed *de novo*. *Marquez-Marquez v. Gonzales*, 455 F.3d 548, 554 (5th Cir. 2006), *citing Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir. 2004). The standard of review is highly deferential to the administrative agency, and a court should not substitute its own judgment for that of the agency. *Citation Oil & Gas Corp. v. U.S. Dept. of Interior*, 2011 WL 5025486, *2 (5th Cir. 2011), *citing*

_____

[3] As noted earlier by this Court, the Administrative Procedure Act ("APA") provides for judicial review of a "final agency action." 5 U.S.C. § 704. An agency action is "final" for purposes of the APA where the action represents the "consummation of the agency's decision making process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Such finality allows an agency to apply its expertise and to correct its errors, while preventing courts from engaging in "piecemeal review which at the least is inefficient and upon completion of the agency might prove to have been unnecessary." *FTC v. Standard Oil Co.*, 448 U.S. 232,(HUD regulations under the APA 242 (1980). Nevertheless, federal courts lack the authority to require plaintiffs to exhaust administrative remedies before seeking judicial review if the relevant statute or agency regulation does not mandate exhaustion but rather makes it discretionary. *Darby v. Cisneros*, 509 U.S. 137, 154 (1993); *United States v. Menendez*, 48 F.3d 1401, 1411 (5th Cir. 1995). Such is the situation here. The National Housing Act of 1934, 12 U.S.C. § 1708; 24 C.F.R. § 25.8. Plaintiffs here chose not to appeal their suspensions by the Board.

*Tex. Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).  An agency's actions are arbitrary and capricious "if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998), *quoting Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).  An agency's action, findings and conclusions should also be set aside if they are unsupported by substantial evidence.  5 U.S.C. § 706(2)(E).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  Interpretations of circuit law by the agency, however, are reviewed *de novo*. *Williams v. Admin. Rev. Bd.*,. 376 F.3d 471, 476 (5th Cir. 2004).

Under the stringent standard for obtaining the extraordinary remedy of a preliminary injunction, the plaintiff must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted,

-4-

and (4) the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011), *citing Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).  The plaintiff must carry its burden of persuasion on all four prongs. *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision [after a trial] on the merits."  *I Callaway*, 489 F.2d at 576; *DSC Communications Corp. v. DGI Technologies, Inc.*, 898 F. Supp. 1183, 1187 (N.D. Tex. 1995).

For the first element, the plaintiff's evidence need not prove that plaintiff is entitled to a summary judgment; plaintiff needs only to present a *prima facie* case, but not demonstrate that he is certain to win.  *Id.* at 595-96*, citing id.,* and Charles Alan Wright, Arthur Miller, Mary Kay Kane, 11 *Federal Practice and Procedure* § 2948.3 (2d ed. 1995).  "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Sebastian v. Texas Dep't of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982).  To evaluate the likelihood of success on the merits the court considers the "'standards provided by the substantive law.'"  *Janvey,* 647 F.3d at 596, *citing Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990).

Regarding the second prong, a threat of irreparable harm, the injury at issue must be actual and imminent, not speculative or remote. *Watson v. Federal Emergency Management Agency*, 437 F. Supp. 2d 638, 648 (S.D. Tex. 2006). Under Fifth Circuit law, an injury is irreparable if there is no remedy at law, such as monetary damages. *Janvey*, 647 F.3d at 600; *Enterprise International, Inc. v. Corporacion Estatal Petrolera Equatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985). Even if money damages are available, they may not be adequate. *Janvey*, 647 F.3d at 600. Irreparable injury may be shown where a business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975)("Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."). A recognized exception to the general rule that damages cannot be compensable in monetary relief is "where the potential economic loss is so great as to threaten the existence of the movant's business." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009); *Minard Run Oil Co. v. U.S. Forest Serv.*, ___ F.3d ___, Nos. 10-1265, *et al.*, 2011 WL 4389220, *13 (3d Cir. Sept. 20, 2011). *See also Florida Businessmen v. City of Hollywood*, 648 F.2d 956, 958 n.2 (5th Cir. 1981)("A substantial loss of business

may amount to irreparable injury if the amount of lost profits is difficult or impossible to calculate.").

### Plaintiffs' Motion for Preliminary Injunction

The government has intervened in a *qui tam* fraud action filed in the Southern District of New York, Case No. 11-cv-05443, in which it filed an expanded complaint-in-intervention and sues, *inter alia*, Allied Home Mortgage Capital Corporation ("Capital") and Corp. as Capital's successor in interest.  The suspensions of Corp. and its CEO, Hodge in this action, occurred contemporaneously with the filing of the government's complaint (#2, Exhibit 3) on November 1, 2011.  The current suspensions are dependent on "the outcome of the United States' lawsuit," as stated in the November 1, 2011 Letter (#2, Ex. 1).

Plaintiffs here argue that the gravamen of the conclusory, "unacceptably vague" allegations, unsupported by facts, in the New York suit is against Capital, not Corp., and that none of the facts in that complaint concern Corp.'s conduct.  Corp. is sued solely as "the successor to, and a mere continuation of" Capital, and most of the allegations concern actions by Capital between 2000 and 2010. Plaintiffs insist that HUD's suspension of Corp.'s authority to originate and underwrite loans will put Corp. out of business, and that no amount of damages will be sufficient to resurrect Corp. as a viable business.  FHA-insured mortgage loans constitute 70% of Corp.'s business.  Furthermore Corp has built relationships with

other companies that are dependent upon Corp.'s ability to continue originating FHA loans.  All of Corp.'s financing for mortgage loans (from warehouse financing lines of credit) will be terminated. Thus not only will Corp. be unable to originate FHA-insured mortgage loans, but also unable to originate any kind of mortgage loans.  Without correspondent purchase agreements Corp. will not be able to market any loans it might make.   Its inability to participate in the market during its suspension will cause potential investors and potential business partners to ally with other competitor companies in the same, scarce marketplace. Moreover nearly all of its 723 employees in its 152 active branches across the country will lose their jobs.  Hodge will lose his job, esteem in the industry, and the company he has built over the past twenty years.

Plaintiffs further maintain that the threatened injury to them outweighs any potential harm to the government.   The suspensions will put Corp. out of business and bar Hodge from the mortgage industry before any fact has been proven before any tribunal.   In circular logic, the notice suspending Hodge was issued the same day as the notice suspending Corp. for employing him as a suspended person.  #2, Exhibits 1 and 2.  The Notice to Corp. fails to identify any specific or immediate harm caused by Corp.  The government's New York complaint-in-intervention (#2, Exhibit 3) charges Corp. solely as successor in interest to Capital, the

conduct described in the complaint took place years ago, there is no immediate danger identified, and the government has not sought a TRO against any defendant in that case, unlike in the instant regulatory proceedings against Hodge and Corp.

A preliminary injunction is in the public interest here:  it would prevent the demise of Corp., great professional harm to Hodge, hundreds of jobs from being lost, allow homebuyers to purchase their homes, and prevent investors from suffering losses on their investments.  Plaintiffs also claim the public has an interest in the restrained use of government power, not allowing it to act without cause and without due process.

Plaintiffs contend that HUD's notices of the administrative actions it is taking against Corp. are unacceptably vague, lacking in any informative detail, and illogical.  The first violation alleged in the Notice of Administrative Action served on Corp. on November 1, 2011 (Ex. 1 at 6 to #2) is that "Allied" originated loans from branch offices that were not FHA-approved.  The Notice fails to identify the branch offices or how many or when loans were submitted from these branches.  Allied's purported second violation was "submitt[ing] loans to HUD for FHA mortgage insurance that contained false representations about where the loans were originated," but fails to state how many such loans were submitted, which loans, and from which branches the loans are claimed to have been originated and from which branches they actually originated.

Notice as 6.  As Corp.'s third violation the Notices alleges that "Allied failed to pay the operating expenses for some of its approved branch offices," but again the branch offices are not named.  *Id.*  The fourth charged violation is that "Allied utilized inadequate and unqualified staff for its reviews," again without any identifying details.  The Notice asserts that Allied falsely certified that it implemented a proper quality control plan.  Although the period is identified, the Notice fails to indicate in what manner the quality control plan was inadequate.

Plaintiffs claim that HUD's actions were arbitrary and capricious, that it abused its discretion, and that it violated the United States Constitution for several reasons.  First, the government improperly conflated Corp. and Capital, treating two distinct corporate entities as one for purposes of liability, in both the Notices and in the New York case, which charges acts of Capital over two years old that were already resolved during a HUD audit, with Capital paying the fines.  Second, Defendants served Plaintiffs with Notice of violations simultaneously with suspending them.  Third, HUD abused its discretion in failing to provide essential concrete details of alleged violations, but only conclusory allegations raising an unsubstantiated specter of wrongdoing.  Fourth HUD violated the Constitution by exercising its regulatory power of suspension against Plaintiffs in essence to obtain an effective temporary restraining order and preliminary

injunction that threatens Plaintiffs' business without giving Plaintiffs proper notice and opportunity to be heard, and without obtaining a court order.

### Government's Opposition

The government charges Hodge, CEO of both Capital and Corp., with concealed misconduct for over a decade that poses a risk to the mortgage market and the public insurance fund.  The government contends that the two Allied entities, Capital and Corp., share the same ownership structure, the same headquarters, nearly all the same senior managers, and the same quality control employees, and pose the same risk to the public.  Moreover the two companies offer no response to the substance of the allegations in the New York complaint.  Moreover, they suggest that based on the information available in New York, Hodge's contention that the banks have frozen his accounts, preventing branch managers from withdrawing earned loan commissions, is false.[4]

The government further maintains that Plaintiffs cannot show a likelihood of success on the merits because they cannot show that HUD's actions were arbitrary and capricious as HUD has adequate evidence of a history of serious violations of HUD requirements by Plaintiffs.  Plaintiffs also cannot show irreparable harm because

---

[4] While Plaintiffs assert that Hodge's access to his funds has been denied and his branch managers cannot obtain previously earned commissions, there was no evidence presented to support his allegations.

Corp. can still engage in conventional lending.  Furthermore in a
November 3, 2011, Hodge informed employees that he had established
a new relationship with an investor willing to purchase Corp.'s
loans that would "allow us to get back in business."  In addition,
any harm occasioned by the filing of the New York complaint will
continue through the litigation regardless of the outcome of the
suspensions.   The balance of equities here weighs against
Plaintiffs who have come to court with unclean hands while seeking
equitable relief,   Hodge's and his companies' concealment of
wrongdoing have caused more than $834 million in insurance claims
to be paid by HUD, with the government facing a wave of defaults
that might amount to another $363 million.  Plaintiffs' suggestion
that they will post a bond of $1000 if the Court issues an
injunction trivializes this harm.  Finally, the suspensions are
critical to protecting the health of the public insurance fund

The government details the requirements and procedure for
obtaining and maintaining approval of participation in HUD's
mortgage insurance program (#30 at 3-7), which the Court
incorporates herein as there is no dispute about them.  Capital
participated in the loan correspondent program and was allowed to
originate FHA loans out of HUD-approved branches and then send them
to HUD-approved direct endorsement lenders, such as Corp., or
underwriting approval prior to loan closing and securing an
insurance endorsement from HUD, until the program was discontinued

by the end of 2010.  Reiterating with a supporting Declaration from
Jennifer Lake, ¶ 6(e) that Capital and Corp. have the same
headquarters, ownership structure, management and quality control,
the government states that in late 2010 nearly all of Capital's
branches were closed and immediately reopened as branches of Corp.
Lake Decl., #31 at ¶6.[5]  It asserts that Hodge and his companies

---

[5] According to her Declaration (#31),Lake, a Special Agent
for HUD's Office of Inspector General ("OIG"), participated in
the ongoing investigation by the Civil Frauds Unit of the U.S.
Attorney's Office for the Southern District of New York that
examined the mortgage practices of Capital, Corp. and Hodge.  She
states that because numerous witnesses were concerned about
retaliatory action by Hodge while this investigation proceeds,
they are not identified in her Declaration.  Based on her
personal participation in the investigation, review of documents,
sworn witness testimony, conversations with people and witness
interviews, she generally identifies, as HUD violations by
Capital, that Capital originated FHA loans out of branches that
were not disclosed or approved by HUD and submitted loan
applications to HUD from them with HUD ID numbers of other,
still-approved branches.  She relates that all but a few of
Capital's branches in late 2010-11 were closed and their HUD
approval terminated, but that they were reopened under the name
of Corp. and obtained new HUD IDs, and "the migration of branches
resulted in no substantive changes in corporate ownership
structure, management, loan origination practices, branch
operations and quality control."  Lake Decl. at ¶ 6(e).  **The
Court would point out that this allegation is the only one she
makes about Corp.**  Between 2001-2008 Capital in 2006 and 2008 was
found to be out of compliance with HUD's requirements that as
lessee of the space occupied by each branch Allied pay all
operating expenses for each branch.  It submitted false branch
certifications, failed to implement Quality Control reviews in
accordance with HUD criteria, and when it finally began reviews
of early payment defaults in late 2005 to early 2006, had only
two quality control staff in its corporate office for more than
five hundred branches.  Lake also states that Capital kept 2-5
quality control employees, working for another Hodge-owned entity
called Allquest Mortgage Capital Corporation, later called
AllQuest Financial Services, which in exchange for nominal
services to Capital, collected millions of dollars in fees that

"repeatedly and egregiously violated HUD requirements for the last decade." #30 at 8. One ongoing violation was continuous operation of "shadow branches," i.e., branches not approved by HUD. Since at least 2000, Capital allegedly has originated thousands of FHA loans out of shadow branches by "marrying" an unapproved branch to an approved branch and entering the HUD ID of the approved branch on all the loans originated from the shadow branch. The government claims that Corp. appears to continue the practice today. Lake Decl. ¶6(a)-(e); Declaration of Aaron Horenstein, Financial Analyst in the Office of General Counsel, HUD since June 2003, #29, ¶ 6-11. Because they operate "under the radar," i.e., are not disclosed to HUD, shadow branches cannot be audited by HUD. Horenstein declares that based on publicly available information, i.e., using the Google search engine Facebook, he "discovered that Allied Corporation and Allied Capital are currently operating at least six (6) unapproved branches in the Commonwealth of Massachusetts." #29, ¶¶ 8-42.

        The government also charges that Capital submitted false

_____

Capital later deducted as business expenses on annual financial statements that Capital submitted to HUD. Moreover Capital assigned a few untrained assistants to do quality control reports, but when they were unable to complete them, Hodge purportedly instructed the management to falsify them. Capital also submitted falsified certifications in 2006 and 2007 stating that it had not been sanctioned by any state regulators and that it had not employed individuals convicted of crimes, when it had been sanctioned in multiple states and employed many convicted felons.

information to HUD when it submitted loan packages for mortgage
insurance and concealed the fact that the loans were originated
from branches that were not approved by FHA.   Decl. of Nancy A.
Murray, #28.[6]

## Court's Decision

For purposes of this case and the preliminary injunction, the
focus must be on Corp. and Hodge as its CEO, separate   and
distinguished from Capital and Hodge as its CEO.  While most of the

---

[6] Murray's Declaration states that from 1994-2010 she was a
partner and of counsel at Patton Boggs, LLP in Washington D.C.
where she practiced administrative law with a concentration on
HUD matters.  She has been employed as Director of the Mortgagee
Review Board since May 2010 and serves as its Secretary.   On
October 31, 2011 she convened a special session of the Board
after she was "told" that the Southern District of New York had
evidence of the following fraudulent conduct by Allied
(apparently Capital):  that it had originated loans from branch
offices that were not FHA-approved; that it had submitted false
information to HUD and concealed the fact that the loans
originated from unapproved branches; it failed to ensure that the
corporate entity paid the operating expenses of the FHA approved
branch offices; that it failed to implement a Quality Control
("QC") Plan in compliance with HUD/FHA requirements; that it
submitted false certifications, without implementing a QC Plan,
to HUD when it submitted annual recertification materials from
2006-2011; and that HUD's Office of General Counsel had
sufficient evidence against Hodge to suspend him and proposed to
debar him from participation in all HUD programs.  An employee
also informed here that Allied had been before the Board for past
violation, including violating HUD/FHA requirements for clear and
effective separation of two mortgage companies," i.e., Capital
and Corp.  In several different settlements with HUD monetary
penalties were imposed on Allied.  In general Murray's
Declaration does not distinguish Capital from Corp.  Because
Murray states that she was "told" about all these purported
violations, the Declaration is hearsay.  Like some of the others,
the sources of information are not identified and the Declarants
are not subject to cross examination.

government's documentary submissions and allegations conflate the two corporate entities, little of the material clearly names or separately identifies Corp.  The tie between the two entities is the Asset Purchase Agreement (the "Agreement") of May 1, 2010 between Capital and Corp., Plaintiffs' Ex. 11 filed under seal, and the alleged identical ownership structure, the  headquarters, nearly all the senior managers, and quality control employees.

The Court concludes that HUD erred in acting contrary to the law in Texas as that law applies to Corp. as an alleged successor in interest to Capital based on Corp.'s acquisition of some of the assets of Capital and on the theory that Corp. is a mere "continuation" of Capital.

Capital and Corp. are both Texas corporations.  The Asset Purchase Agreement states in paragraph 12.09:

> **Governing Law.**  This Agreement shall be construed in accordance with applicable Federal Law and the laws of the State of Texas without reference to laws regarding choice of law or forum.  The exclusive venue of any action arising from this Agreement shall be Harris County, Texas and each party waives any objection to venue laid therein.

Moreover, paragraph 2.02 of the Agreement, titled **Excluded Assets**" expressly includes in subsection (b), "any and all liabilities." Paragraph 2.03, styled "**No Liabilities Acquired**," provides in relevant part,

> Unless expressly identified in Schedule 2.01 as a Purchased Asset, Buyer shall assume no Liability whatsoever of the Seller, whether or not arising from or

related to the Seller, the Business or any Purchased Assets (the "<u>Excluded Liabilities</u>"), and the Seller shall pay, perform and discharge as and when due each such Excluded Liability.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, and under no circumstances shall Buyer be deemed to assume, any Liability of the Seller arising out of or relating to . . .

(c) any actual or alleged tortious conduct of Seller or any of its officers, employees or agents; . . .

(i) any Liability relating to the ownership. operation, use or disposal of any Excluded Assets; . . .

(n) any Liability arising out of any business activity or operations of the Seller after the Effective Time;

(o) any Liability under or arising by reason of this Agreement, or incurred in connection with the transactions contemplated by this Agreement . . .;

(p) any claims, chose in action, causes of action, rights of recovery, rights of set-off, or grievances of any kind of any third party . . . arising out of the conduct of the Seller, the Business, any other business or operations of the Seller, or the ownership of any Purchased Assets prior to the Effective Time.

Texas law does not generally recognize successor liability for subsequent purchases of corporate assets.  *Norfolk Southern Ry. Co. v. Trinity Industries, Inc.*, No. 3-07-CV-1905-F, 2009 WL 362437, *4 (N.D. Tex. 2009), *citing McKee v. Am. Transfer & Storage*, 946 F. Supp. 485, 487 (N.D. Tex. 1997), *citing* Article 5.10(B) of the Texas Business Corporation Act , effective Sept. 1, 1993.  There is no successor in interest when the acquiring corporation did not expressly agree to assume the liabilities of the party to the agreement because "'successor'" has a specialized meaning beyond simple acquisition.'"  *Sitaram v. Aetna U.S. Healthcare of N. Tex.,*

*Inc.*, 152 S.W. 3d 817, 728 (Tex. App.--Texarkana 2004). *See also C.M. Asfahl Agency v. Tensor*, *Inc.*, 135 S.W. 3d 768 (Tex. App.--Houston [1ˢᵗ Dist.] 2004)(finding no successor liability because there was no express assumption by the successor to acquire the liability of the predecessor); *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, Civ. A. No. H-08-2911, 2010 WL 1417900, *5-6 (S.D. Tex. Apr. 7, 2010), *citing Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 134 -35 & n.6 (Tex. App.--Houston [1ˢᵗ Dist. 2000, pet. denied)(The only two circumstances in which a successor business that acquires the assets of another business also acquires its liabilities or debts are (1) the successor expressly agrees to assume liability or (2) the acquisition results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor.). While the government may have vaguely implied there was a fraudulent conveyance of Capital's assets to Corp. to escape Capital's liability, it did not produce evidence of such.

Furthermore the Texas legislature has refused to recognize the theory that a successor corporation is a mere continuation of its predecessor as an exception to the traditional rule that a successor corporation does not assume the liabilities of a predecessor. *Motor Components, LLC v. Devon Energy Corp.*, 338 S.W. 3d 198, 204-05 (Tex. App.--Houston [14ᵗʰ Dist.] 2011)(citing Act of May 4, 1979, 66ᵗʰ Leg., R.S., ch. 194, § 1, 1979 Tex. Gen. Laws. 422, 422-23 (amended 1987, 1991, 1993, and 1997, recodified

2002)(current version at Tex. Bus. Orgs. Code Ann. § 10.254 (West 2009)), *citing Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 649 (5th Cir. 2002)(applying Florida law).  Section 10.254 provides,

> (a) A disposition of all or part of the property of a domestic entity, regardless of whether the disposition requires the approval of the entity's owners or members, is not a merger or conversion for any purpose.

> (b) Except as otherwise expressly provided by another statute, a person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring entity that is not expressly assumed by the person.

The Fourteenth Court of Appeals in *Motor Components*, 338 S.W. 3d at 205, further cited *inter alia* the following cases and their holdings:  *Mudgett v. Paxson Machine Co.*, 709 S.W. 2d 755, 758 (Tex. App.--Corpus Christi 1986, writ ref'd n.r.e.)("Certainly if the de facto merger doctrine is contrary to the public policy of our state, so must be the mere continuation doctrine."); *McKee v. American Transfer & Storage*, 946 F. Supp. 485, 487 (N.D. Tex. 1996)("The Texas Business & Corporations Act eliminates the doctrine of implied successor liability.").

   "Under the APA, a court may set aside agency actions found to be "arbitrary and capricious" because they are "not in accordance with law."  5 U.S.C. § 706(2)(A).  Plaintiffs are correct that HUD's suspension of Corp. and Hodge as its CEO, based on a successor corporation/continuation doctrine and an improper conflation of the two entities, transferring Capital's alleged

liability for misconduct to Corp., is contrary to Texas law.  In purchasing most of Capital's assets and expressly indicating that it was not purchasing any liabilities, Corp. and Hodge were acting legally under Texas law.  The purchase of Capital's branches by Corp. began around September-October 2010, before which Corp, had no branches.  The government has not produced evidence demonstrating that Corp. has violated the law since it acquired most of Capital's assets.  Indeed it acknowledged at the hearing that the history of Corp. since its acquisition of assets of Capital is short and that evidence about it thus far is limited. Nevertheless Corp.'s figures in HUD's Credit Watch or Neighborhood Watch performance numbers (Plaintiffs' Exhibit #23) reflect it is better than average in comparison to other FHA-insured mortgage lenders across the country.  Moreover the vague and conclusory nature of the allegations in the Notices, which Corp. and Hodge argue deprive them of adequate notice and due process, in the *qui tam* complaint, and in the government's Declarations serves to obfuscate which corporation is responsible for what violations.

Therefore the Court finds that Plaintiffs have met the requirements for a preliminary injunction enjoining the suspensions of Corp. and of Hodge in his capacity as CEO of Corp.  Plaintiffs have made a *prima facie* case of a likelihood of success on the merits of their suspension based on a continuation theory and the Asset Purchase Agreement under Texas law for reasons indicated

above, and the absence of evidence of wrongdoing by Corp. since
that acquisition.  They have also submitted substantial evidence
that the suspensions actually and imminently threaten the very
existence of Corp.'s business and Hodge's professional position in
the mortgage industry, thus making money damages, only after the
New York litigation is ultimately resolved, inadequate  to satisfy
the irreparable injury prong.  In the wake of HUD's suspensions,
Plaintiffs have also been suspended by Ginnie Mae, Fannie Mae and
the State of Maine.  Their warehouse lines of credit have dried up.
The potential destruction of Plaintiffs' business outweighs any
harm that would be suffered by the government before the issues can
be litigated in the New York *qui tam* action.  The substantial loss
to HUD of over $800 million in taxpayer funds was allegedly caused
by the conduct of Capital years ago.  As noted there are plenty of
broad-sweeping accusations against, but no evidence of wrongdoing
by, Corp. since its acquisition of Capital's assets.  The issuance
of a preliminary injunction, on the other hand, would serve the
public interests in preserving Corp.'s business, over 700 jobs for
its employees, the opportunity for those low income clients who
were approved for mortgages to close on their homes, and the
opportunity for others to borrow and purchase homes.  The
government will still have an opportunity to prove its allegations
and Plaintiffs to receive due process and defend themselves in the
New York *qui tam* suit.

Finally, Federal Rule of Civil Procedure 65(c) provides

> The court may issue a preliminary injunction . . .only if
> the movant gives security in an amount that the court
> considers proper to pay the costs and damages sustained
> by any party found to have been wrongfully enjoined . .
> . .

The Fifth Circuit has held that courts in this Circuit have the discretion to issue injunctions without security. *EOG Resources, Inc. v. Beach*, 54 Fed. Appx. 592, No. 02-60415, 2002 WL 31730385, *1 n.2 (5th Cir. Nov. 26, 2002), *citing Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978)(per curiam); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 & n.18 (5th Cir. 1996)(the court in its discretion "'may elect to require no security at all'"), *quoting Corrigan*, 569 F.2d at 303.

Accordingly, the Court

ORDERS that Plaintiffs' motion for preliminary injunctive relief is GRANTED and HUD is hereby ENJOINED from enforcing its suspensions of Plaintiffs. The Court further finds that no bond is necessary here. Should the government uncover evidence of fraud by Corp. and Hodge as its CEO, it may apply to lift the injunction.

**SIGNED** at Houston, Texas, this __15th__ day of __November__, 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE