UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIED HOME MORTGAGE CORPORATION, *et al.*, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION H-11-3864 |
| SHAUN DONOVAN, SECRETARY, UNITED STATES DEPT. OF HOUSING AND URBAN DEVELOPMENT, *et al.*, | § § § § | |
| *Defendants*. | § § | |

MEMORANDUM AND ORDER

Pending before the court is defendants Shaun Donovan and the United States Department of

Housing and Urban Development's (collectively "defendants") opposed expedited motion to transfer

venue (Dkt. 12), and motion to dismiss for lack of subject-matter jurisdiction (Dkt. 56).   After

considering the motions, responses, and the applicable law, and for the reasons set forth below, the

motion to transfer venue is DENIED, and the motion to dismiss for lack of subject-matter

jurisdiction is GRANTED IN PART and DENIED IN PART.

I. BACKGROUND

James C. Hodge ("Hodge") is the president and chief executive officer of Allied Home

Mortgage Corporation ("Allied"), a mortgage lender and originator of FHA-insured residential

mortgage loans.[1]   Dkt. 1.   More specifically, Allied was classified as a non-supervised, Title II

lender, pursuant to 24 C.F.R. parts 202.5 and 202.7.   Dkt. 60, Ex. 4.   On November 1, 2011, the

United States intervened in a *qui tam* fraud action filed in the Southern District of New York, Case

---

[1]  In January 2012, following commencement of this action, Allied Home Mortgage Corporation changed its name and registration with the Texas Secretary of State to Allquest Home Mortgage Corporation.  This order refers to plaintiff as Allied for purposes of clarity and continuity.

No. 11-cv-05443 (the "SDNY lawsuit"), in which it filed an expanded complaint-in-intervention and sued, *inter alia*, Allied Home Mortgage Capital Corporation and Allied Home Mortgage Corporation as its successor-in-interest. Dkt. 12, Ex. 2.  Contemporaneously with the SDNY lawsuit, HUD sent to plaintiffs notices of their suspension ("November notices") and proposed debarment pursuant to 12 U.S.C. § 1708(c) and 24 C.F.R. part 25 (Allied), and 2 C.F.R. parts 180 and 2424 (Hodge).  Dkt. 1, Ex. 1-2.  The November notices indicated that the suspension and debarment were dependent on the outcome of the SDNY lawsuit.  *Id*.

HUD's November notice to Allied alleged, under 24 C.F.R. part 25.6, that it (1) originated loans from branch offices that were not FHA-approved, (2) submitted loan packages to HUD containing false information about where the loans originated, (3) failed to ensure the corporate entity paid the operating expenses of its FHA-approved branch offices, (4) failed to implement a quality control program in compliance with HUD's requirements, (5) submitted false annual recertification materials to HUD for the years 2006-2011, and (6) employed a principal, officer, or director when that person was suspended.  Dkt. 1, Ex. 1.

HUD's November notice to Hodge likewise alleged various forms of misconduct.  Dkt. 1, Ex. 2.  Hodge allegedly instructed Allied employees and representatives to violate HUD requirements and caused the submission of false statements to the department.  *Id.*

HUD's November notices further explained that because Allied was one of the largest FHA-approved brokers, implementation of an immediate suspension was proper in the name of the public and department interest.  Dkt. 1, Ex. 1-2.  Despite the suspensions taking immediate effect, the notices did provide a manner in which to contest HUD's findings and to request an informal hearing.  *Id.*  Plaintiffs chose instead to file this action.  Dkt. 1.

Plaintiffs seek declaratory and injunctive relief to challenge HUD's suspension of Allied's authority to originate and underwrite FHA-insured loans, and the debarment of Hodge from participating in procurement and non-procurement transactions.   Plaintiffs contend that HUD's actions were arbitrary and capricious and effected without due process of law.  Dkt. 1.  They base these claims on alleged factual errors and procedural defects underlying the suspension and debarment decisions.  *Id.*  For example, plaintiffs point out that one basis for HUD's suspension of Allied is employing a suspended principal, officer, or director.  *Id.*  They further point out that the suspensions were issued to both Allied and Hodge on the same day.  *Id.*  Plaintiffs assert that basing Allied's suspension, in part, on its employment of Hodge while he was suspended violated due process by simultaneously punishing for, and notifying of, an infraction.  *Id.*

Plaintiffs further complain that HUD's actions, without opportunity to be heard, have prevented them from originating FHA-insured loans that constitute 70% of Allied's business.  *Id.* As a result, plaintiffs' various financial institutions have  terminated their warehouse lines of credit, preventing Allied from originating *any* sort of mortgage loan, whether FHA-insured or not.[2]  Dkt. 1.  Fifteen days after the suspension and debarment were noticed, and after an evidentiary hearing, this court[3] granted plaintiffs' motion for preliminary injunction, enjoining defendants from enforcing their administrative action pending further review.   Dkt. 37.

On May 23, 2012, HUD and its Mortgagee Review Board ("MRB") sent three notices to plaintiffs: (1) rescinding Allied's November notice of suspension, (2) notifying Allied that the MRB was considering taking administrative action and seeking monetary penalties, and (3) providing

---

[2] Plaintiffs claim that one line of credit, extended prior to the suspensions in the amount of $50 million, was suspended and has since been restored to $5 million.  All other pre-suspension lines of credit have been suspended or terminated. Dkt. 60, Ex. 4.

[3] Judge Melinda Harmon heard the motion on an expedited basis and issued the resulting order.

notice of HUD's proposed debarment of Hodge, superseding the original November notice.  Dkt. 57, Ex. A-C.

## II. ANALYSIS

### A. Expedited Motion to Transfer Venue

Defendants move the court to transfer this case to the Southern District of New York, arguing that plaintiffs' instant action presents claims and issues that are substantially similar to those raised in the SDNY lawsuit, and this court should adhere to the first-to-file rule and grant their motion to transfer.  Dkt. 12.  Plaintiffs respond that transferring the action is improper because (1) the claims are not substantially similar, and in fact raise distinct issues, (2) HUD is not a party to the SDNY lawsuit, and (3) neither Allied nor Hodge possess sufficient contacts with that forum to support jurisdiction.  Dkt. 16.

#### 1. Legal Standard

Defendants move to transfer venue pursuant to the first-to-file rule.  The rule is "grounded in the principles of comity and sound judicial administration."  *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997).  It is a discretionary doctrine and may be applied when related cases are pending before two federal courts.  *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999).  The cases need not be identical, but "the crucial inquiry is one of substantial overlap."  *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 678 (5th Cir. 2011).  "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."  *Save Power*, 121 F.3d at 950.

#### 2. Analysis

In the SDNY lawsuit, the government alleges fraudulent acts and omissions on the part of

plaintiff, reaching back to 2001.  Dkt. 1, Ex. 3.  The claims in that suit are substantially similar to the claims made by HUD in support of its November and May notices.  *Id*. at Ex. 1-3; Dkt. 57, Ex. B-C.  That similarity, however, is not dispositive of whether the claims made in the SDNY lawsuit and by HUD are substantially similar to the claims plaintiffs make against HUD in this court.

Defendants direct the court's attention to *Twin City Ins. Co. v. Key Energy Servs., Inc.*, No. H-09-0352, 2009 WL 1544255 (S.D. Tex. June 2, 2009), to support their argument that this case falls squarely within the contours of a transfer pursuant to the first-to-file rule.  Dkt. 12.  In *Twin City*, a first-to-file scenario arose between Key Energy and its insurer, Twin City, following the parties' unsuccessful arbitration attempt.  *Twin City*, 2009 WL 1544255 at *2.  There, the parties each filed competing suits in different courts, alleged the same (but counter-positioned) claims, and alleged those claims arose from the same material facts.  *Id*.  The first-to-file rule was applied to dismiss the second suit and transfer it to the court where the first-filed action was pending.  *Id*. at *7.  However, *Twin City* is inapposite.  Unlike the SDNY lawsuit, where the government alleges fraud, the claims in this case are alleged to arise from improper administrative action that is continuing to harm plaintiffs.  Here, defendants are not a party to the SDNY lawsuit, the claims and relief sought are dissimilar, and the instant allegations are only tangentially related to those alleged in the SDNY lawsuit.

Plaintiffs claim that, despite the preliminary injunction, the suspension and debarment during the fourteen-day period before the injunction issued causes them continuing injury by damaging their reputation.  They allege that defendants' arbitrary and capricious actions have prevented them from obtaining or reinstating their warehouse lines of credit and good corporate standing with several states.  Dkt. 60.

Without speculating on the merits of plaintiffs' remaining claim, a declaration from this court that the suspensions and debarment were or were not void, *ab initio*, would not "trench upon the authority of [the Southern District of New York,]" nor generate "piecemeal resolution of [the government's fraud claim in the SDNY lawsuit.]" *See Save Power*, 121 F.3d at 950. Therefore, the claims and issues remaining in the instant action are substantially *dissimilar* from the government's *qui tam* action in the Southern District of New York. Accordingly, the court declines to transfer the case to that forum. Defendants' opposed expedited motion to transfer venue is DENIED.

## B.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendants move for judgment on the pleadings under FED. R. CIV. P. 12(c), arguing that circumstances have arisen during the pendency of this case that have rendered plaintiffs' claims moot. Dkt. 56. The May notices rescinded HUD's November suspension and debarment action, and defendants urge the court that the May notices enhanced the specificity of the alleged violations and merely provide *notice* of potential administrative action. *Id*. Defendants argue this action cures the procedural defects Judge Harmon found in her preliminary injunction, thus providing the relief that plaintiffs sought in their complaint and rendering the action moot. *Id*. Plaintiffs oppose this motion on two grounds. Dkt. 60. First, plaintiffs argue that defendants' voluntary cessation of alleged illegal conduct, followed by motion practice attempting to moot the controversy, imposes a stringent burden that defendants in this case cannot meet. *Id*. Second, they argue that only their injunctive relief claims are moot. *Id*. The collateral consequences doctrine permits their alleged continuing injury to survive Article III mootness scrutiny; therefore, they contend their declaratory judgment claims remain ripe. *Id*. Because plaintiffs seek both injunctive and declaratory relief, the court assesses the propriety of defendants' motion with respect to each form of relief sought.

### 1. *Legal Standard*

Article III of the Constitution limits this court's jurisdiction to "cases" or "controversies" and encompasses the jurisdictional doctrine of mootness and standing.  U.S. Const. art. III, § 2, cl. 1; *In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 529 U.S. 167, 189 (2000).  Article III standing is established by three elements: (1) the plaintiff must have suffered an injury in fact, an invasion of a legally protected interest, that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) there must be a causal connection that is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court[,]" and (3) it must be likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).  Further, a federal court lacks constitutional authority to determine the merits of a moot case or controversy.  *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008).  "A controversy becomes moot where, as a result of intervening circumstances, there are no longer adverse parties with sufficient legal interest to maintain the litigation."  *In re Scruggs*, 392 F.3d at 128 (*quoting Chevron U.S.A., Inc. v. Traillor Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993)).  Mootness has been described as "a time dimension of standing, requiring that the interests originally sufficient to confer standing persist throughout the suit.  The distinctive mootness label, however, helps concentrate attention on the peculiar problems of a suit's death, rather than its birth."  13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3533.1 (3d ed. 1998).

### 2. *Analysis - Injunctive Relief*

Plaintiffs argue that a defendant who voluntarily ceases illegal conduct bears the burden of convincing the court that he will not resume his conduct.  A defendant's voluntary cessation of a

challenged practice does not deprive a federal court of its power to determine the legality of the practice. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Id*. at 289 n.10 (*quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)). To further that principle, the standard for determining whether a case has been mooted by a defendant's voluntary conduct is stringent, and it is only met if "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (*quoting United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).

HUD notified Allied on May 23, 2012 that the MRB had rescinded the immediate suspension issued in November. Dkt. 57, Ex. A. On the same day, in its notice of violation and notice of intent to seek civil monetary penalties, HUD stated that its MRB was "*considering* taking an administrative action against [Allied]." *Id*. at Ex. B (emphasis added). One week after Allied's notification, HUD notified Hodge that it was "*proposing* [his] debarment . . . for five years." *Id*. at Ex. C (emphasis added). Additionally, the May notice to Hodge indicated that it "supersede[d] HUD's [November notice]." *Id*. Each of the May notices indicated that plaintiffs were permitted to supply written information and argument prior to the determination of final action. *Id*. at Ex. B-C.

To provide Allied with sufficient notice, the MRB's notification of potential administrative action must specifically state the reasons for the action. *See* HUD Mortgagee Review Board, 24 C.F.R. § 25.9(b). The May notice segregates the alleged violations into regulatory sub-parts. Dkt. 57, Ex. B. In its first allegation, the MRB claims that Allied failed to comply with a condition necessary to maintain FHA approval, namely, its failure to maintain an approved quality control program. *Id*. The notice provides the number and dates of allegedly noncompliant quality control reviews and refers to individuals that performed them. *Id*. The allegation further specifies the

8

precise provisions of the HUD handbook that the conduct violates. *Id*. The remaining seven allegations are also indicative of the specificity discussed above, including account numbers of noncompliant loans, addresses of noncompliant branch offices, and names and dates of individuals alleged to falsely certify documents. *Id*. While these allegations are specific and detailed, they are also simple, concise, and direct.

When it proposes an individual debarment action, HUD must meet statutory notice requirements. HUD's notice to Hodge must include, *inter alia*, "the reasons . . . in terms sufficient to put [Hodge] on notice of the conduct or transactions upon which the proposed debarment is based." *See* OMB Guidelines to Agencies on Governmentwide Debarment and Suspension, 2 C.F.R. § 180.805(b). Additionally, HUD may "impute the . . . improper conduct of [Allied] to [Hodge] if [he] either participated in, had knowledge of, or reason to know of the improper conduct." *See id*. § 180.630(b).

Hodge's proposed debarment is grounded on (1) irregularities in his own acts or omissions as an officer of Allied and (2) acts or omissions of Allied that are imputed to him pursuant to 2 C.F.R. part 180.630(b). Like the sufficiency analysis of Allied's notice, above, a full recitation of Hodge's notice is unnecessary here. HUD's third allegation is directed at Hodge's individual actions, and claims that Hodge submitted or caused the submission of false certifications to HUD. Dkt. 57, Ex. C. The notice indicates the specific chapters and sections of the HUD handbook alleged to be violated, and provides the dates of the allegations, the titles of the allegedly false documents, and the reasons HUD believed them to be false. *Id*. The remaining allegations pertain to alleged violations, on Allied's part, that HUD is imputing to Hodge. *Id*. Like the notice of violations to Allied, discussed above, these allegations provide a similar level of specificity, including FHA case

and loan numbers that violated quality control guidelines, dates of irregularities, addresses of noncompliant branch offices, and specific reasons that HUD has for each allegation.  *Id*.

Plaintiffs respond that the May notices demonstrate defendants' propensity to engage in "substantially similar" conduct to that complained of in their original complaint.  Dkt. 60.  Their support for this is that the allegations raised in the May notices are "flagrantly unsupportable or incorrect," and indicate a lack of good faith on the part of defendants.  *Id*.  These are merit-based arguments, and the court need not reach the merits of plaintiffs' case in a jurisdictional challenge.  *See Envtl. Conservation Org.*, 529 F.3d at 524.

The May notices do not deprive plaintiffs of their authority or abilities until further review and opportunity to be heard, and they provide specificity and details of alleged violations sufficient to put plaintiffs on notice of the conduct or violations alleged.  The *Friends of the Earth* standard requires that any speculation regarding future wrongful conduct be beyond that necessary to make the court "absolutely clear" it will not recur.  *See Friends of the Earth*, 528 U.S. at 189.  In this case, defendants have not only cured their defective actions, but there is also no question for the court regarding possible future conduct—HUD has made it "absolutely clear that the allegedly [improper notice procedure and administrative action complained of] could not reasonably be expected to recur" because they have *already* acted properly.  *See id*.  Accordingly, plaintiffs' request for injunctive relief is MOOT, and defendants' motion to dismiss this claim is GRANTED.  Accordingly, the court also VACATES the November 15, 2011 preliminary injunction as MOOT.

### 3.  *Analysis - Declaratory Relief*

Defendants argue that any claims for declaratory relief should be dismissed, along with the injunctive relief claims, because harm to reputation is not a continuing injury sufficiently concrete to avoid mootness.  Dkt. 62.  They further argue that declaratory relief would be purely advisory as

10

it would not redress plaintiffs' asserted injuries nor prevent future enforcement action.  *Id*.  In their opposition, plaintiffs argue that merely superseding the November notices does not void them, *ab initio*.  Dkt. 60.  Further, they argue that the fourteen-day suspension and debarment exists and continues to harm them, and that their continuing harm satisfies the collateral consequences exception to the mootness doctrine.  *Id*.

Defendants argue that plaintiffs cannot satisfy the collateral consequences standard, which states that to meet the case-or-controversy requirement, a reputational injury that continues after resolution of the underlying claim must be specific and concrete.  *Spencer v. Kemna*, 523 U.S. 1, 14-16 (1998) (holding, in the criminal conviction and parole context, that "some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained."); *see also Foretich v. United States*, 351 F.3d 1198, 1212-13 (D.C. Cir. 2003) (extending *Spencer* to a civil setting and holding that reputational injury from unexpired and unretracted legislative action is sufficiently concrete so as to prevent mootness and confer standing); *O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 81-84 (D.D.C. 2011) (holding plaintiff lacked standing to assert injury to his reputation resulting from debarment action because the debarment expired before suit was filed, his claims were conclusory, and his claims asserted harmful action from third parties not before the court).  Defendants' reply to plaintiffs' opposition contends that the withdrawn suspensions have no legal effect, that plaintiffs' assertions of reputational harm are entirely conclusory, and that they allege no concrete, traceable injury resulting from the suspension and debarment actions.  Dkt. 62.

Plaintiffs counter that the presence of their prior suspension and debarment has and will continue to harm them by (1) prohibiting them from obtaining and maintaining warehouse lines of credit and affecting other relationships with private financial institutions, (2) affecting their dealings

11

with HUD and state regulators,[4] (3) affecting their relationship with past and present employees, and (4) affecting their relationship with private entities with whom they have done or will do business. Because plaintiffs' first and second alleged injuries are sufficiently concrete, it is unnecessary for the court to address their third or fourth points.

Prior to the suspension and debarment action, plaintiffs maintained warehouse lines of credit with three private financial institutions, Wells Fargo Bank, Customers Bank, and Texas Capital Bank. Dkt. 60, Ex. 4.  On November 1 and 2, 2011, these institutions suspended or terminated plaintiffs' warehouse lines of credit, prohibiting them from funding pending loan activity.  *Id*.  To date, plaintiffs assert that Texas Capital Bank is the only institution to have restored Allied's line of credit, but only to 10% of its previous level.  *Id*.  Non-supervised Title II lenders, like Allied, are required to maintain warehouse lines of credit "acceptable to the Secretary which is adequate to fund the mortgagee's average 60 day origination operations." 24 C.F.R. § 202.7(b)(3)(ii).  While plaintiffs' claimed injury brings third parties into the analysis, the suspension or termination of their warehouse lines of credit is a third party effect that is alleged to be caused by defendants' acts, and HUD's own regulatory mandate would cause further harm because of that effect.  Accordingly, while the court "cannot

---

[4] While plaintiffs' first and second alleged injuries are explicitly stated, they do not provide the court with an explanation of how the relevant regulatory mechanisms will harm them.  Ordinarily, if the court considers matters outside the pleadings for a Rule 12(c) motion, Fed. R. Civ. P. 12(d) requires that it treat the motion as one for summary judgment under Rule 56.  But as the Fifth Circuit has stated:

> In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case.

*Montez v. Dep't of the Navy*, 392 F.3d 147, 149-50 (5th Cir. 2004).  This court may consider federal and state statutes and regulations of which it takes judicial notice, and may do so when considering a motion for judgment on the pleadings. 44 U.S.C. § 1507; *see also Montez*, 392 F.3d. at 149-50.

presume either to control or predict" the relevant financial institutions' future business decisions (*See Lujan*, 504 U.S. at 562), if plaintiffs prevail on the merits of their claim, a declaration from this court would likely prevent defendants' actions from harming them, albeit one step removed.

Next, plaintiffs allege the suspension and debarment continue to harm their relationship with HUD and state regulators. Hodge was debarred in November pursuant to federal debarment and suspension regulations, in part by 2 C.F.R. part 180, and those regulations are virtually dispositive of the mootness question. In considering his debarment pursuant to the May notices, the debarring official "may consider," as an aggravating factor, "whether there is a pattern or history of wrongdoing . . . similar to that found in the debarment action." *See* 2 C.F.R. § 180.860. The May notice of proposed debarment alleged similar acts and omissions as those alleged in the November notices, albeit with substantially greater specificity. Dkt. 1, Ex. 2; Dkt. 57, Ex. 3. The regulation's use of the word "may" indicates a grant of discretion to the debarring official, but his actual ability and potential to exercise it, and the fact that its mere existence would likely compel plaintiffs to explain and defend against the prior debarment, weigh heavily in favor of denying defendants' motion. Any judgment from this court, that the November debarment was void, *ab initio*, would be instructive to a future debarring official reviewing the May debarment notice, and would prevent him or her from considering the November notice as an aggravating factor.

Allied's alleged harm is similarly well founded. Applicants for participation and maintenance of authority in non-supervisory Title II programs must meet an array of standards in addition to the general approval standards established in 24 C.F.R. part 202. The general approval standards require the HUD secretary be notified if plaintiffs are subject to suspension or debarment. *See* 24 C.F.R. § 202.5. The regulation prohibits the approval or maintenance of a lender if it, or an officer, is "subject to unresolved findings as a result of HUD or other governmental . . . review." *Id.* § 202.5(j)(3).

Further, as discussed above, HUD's own mandate that Allied obtain and maintain warehouse lines of credit pursuant to 24 C.F.R. part 202.7(b)(3)(ii) has and will continue to prevent the company from obtaining loan-origination authority.

With respect to state action, the court may take judicial notice of state law without plea or proof. *United States v. Schmitt*, 748 F.2d 249, 255 (5th Cir. 1984). The court takes notice of state statutes requiring the state debarment of individuals or entities that have been debarred from federal programs. *See, e.g.*, Md. Code Ann., State Fin. & Proc. § 16-203(c); Mass. Gen. Laws Ann. ch. 29, §29F(2); 62 Pa. Cons. Stat. Ann. § 531(b)(9); W. Va. Code Ann. § 5A-3-33c to 33d. Further, HUD's general approval standards require authorized loan originators to certify that no states have refused them a business license. 24 C.F.R. § 202.5(m). Unlike the harm posed by plaintiffs' inability to obtain warehouse lines of credit and HUD's aggravating factors, above, the causal chain between defendants' actions and any state action is direct. It is clear to the court that plaintiffs could be subject to state debarment action, and any such action, resulting from defendants' alleged wrongful conduct, would continue to harm plaintiffs in a concrete and particularized manner.

Because the court is satisfied that plaintiffs' allegations of continuing harm as a result of defendants' conduct is concrete and particularized, it holds that defendants' motion to dismiss plaintiffs' declaratory relief claim should be DENIED.

### III. CONCLUSION

After consideration of the motions, the responses, and the applicable law, defendants' opposed expedited motion to transfer venue (Dkt. 12) is DENIED. Defendants' motion for judgment on the pleadings (Dkt. 56) is GRANTED IN PART and DENIED IN PART. The November 15, 2011 preliminary injunction is VACATED AS MOOT, and the defendant's motion to reconsider (Dkt. 42) is also DENIED AS MOOT.

It is so ORDERED.

Signed at Houston, Texas on August 8, 2012.

_____
Gray H. Miller
United States District Judge