# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIED HOME MORTGAGE CORPORATION, *et al.,* | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION H-11-3864 |
| SHAUN DONOVAN, SECRETARY, UNITED STATES DEPT. OF HOUSING AND URBAN DEVELOPMENT, *et al.,* | § § § § | |
| *Defendants.* | § § | |

### MEMORANDUM OPINION & ORDER

Pending before the court are cross motions for summary judgment filed by plaintiffs (Dkt. 89) and defendants (Dkt. 91). After considering the motions, responses, administrative record, and applicable law, the court is of the opinion that plaintiffs' motion should be DENIED and defendants' motion should be GRANTED.

## I. BACKGROUND

James Hodge (a/k/a Jim Hodge) ("Hodge") was the President of Allied Home Mortgage Corporation ("Allied Corp") and Allied Home Mortgage Capital Corporation ("Allied Capital"). Dkt. 83, Administrative Record ("AR") 007. In late 2010, Allied Corp purchased most of Allied Capital's mortgage loan branches. *Id.* at ¶ 30; Dkt. 37 at 20. Prior to that date, Allied Corp did not own or operate any branches. *Id.*

The United States Attorney's Office in the Southern District of New York (S.D.N.Y.) began investigating the conduct of Allied Corp, Allied Capital, Hodge, and Jeanne Stell ("S.D.N.Y. Investigation") based on the high default rates of loans underwritten by Allied Corp. Dkt. 83, ¶8.

On October 25, 2011, the U.S. Attorney's Office filed a complaint in the S.D.N.Y. asserting various civil fraud claims against Allied Capital, Allied Corp, Hodge, and Jeanne Stell under the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act for making false statements and false claims to the Federal Housing Administration ("FHA") in connection with HUD-insured mortgage loans.  AR 047-085.

During the course of the S.D.N.Y. Investigation, 27 former employees of Allied Corp or Allied Capital were interviewed, including the former General Counsel, Chief Financial Officer, Corporate Comptroller, Senior Vice President and Director of Production, Senior Vice President and Director of Training, Senior Vice President and Branch Coordinator, Vice President and Director of Branch Operations, two Quality Control Managers, five National Underwriting Managers, Director of Compliance, Director of Secondary Marketing, Tax Manager, two Chief Information Officers, Director of Human Resources, an underwriting coordinator, an underwriter, a branch auditor, and four branch managers.  Dkt. 83, ¶11.  The Department of Justice also conducted four depositions of: (1) Michael Clendennen, Allied Capital's former Corporate Comptroller; (2) Pamela Boyles, Allied Capital's former National Underwriting Manger; (3) Lorie Hiatt, Allied Capital's former Quality Control Manager; and (4) Jonathan Fowler, Allied Capital's former Senior Vice President and Director of Production.  *Id.* at ¶12.  Subpoenas were issued to Allied Capital and Allied Corp, resulting in the production of approximately 170,000 pages of documents.  *Id.* at ¶13. Documents were also obtained from individual witnesses and state banking authorities, as well as from other litigation involving Allied Capital, including deposition transcripts of Hodge and Jeanne Stell.  *Id.*  The suspensions issued by the Department of Housing and Urban Development ("HUD") were based, in large part, on the evidence uncovered during the S.D.N.Y. Investigation.  *See id.* at

5 n.4 (stating that the draft complaint in the civil fraud action "was one of the primary documents upon which HUD relied upon in rendering the Suspensions").

On November 1, 2011, Hodge received a Notice of Suspension and Proposed Debarment from HUD immediately suspending him from participation in procurement and nonprocurement transactions as a participant or principal, with HUD and throughout the Executive Branch of the Federal Government. AR 007-010.  HUD further proposed debarment from future participation with HUD for a period of five years.  *Id.*  The suspension was temporary pending the completion of the debarment proceedings.  *Id.*  HUD based its suspension "upon information indicating irregularities of a serious nature in [Hodge's] business dealings with the Government," constituting adequate evidence for suspension under 2 C.F.R. §§ 180.700[1] and 180.705.[2]  AR 007.  The "irregularities"

---

[1]  Title 2, Code of Federal Regulations, Section 180.700 establishes when a suspending official may issue a suspension.  It provides as follows:

Suspension is a serious action. Using the procedures of this subpart and subpart F of this part, the suspending official may impose suspension only when that official determines that--

(a) There exists an indictment for, or other adequate evidence to suspect, an offense listed under § 180.800(a), or

(b) There exists adequate evidence to suspect any other cause for debarment listed under § 180.800(b) through (d); and

(c) Immediate action is necessary to protect the public interest.

[2]  Entitled "What does the suspending official consider in issuing a suspension?", Section 180.705 provides:

(a) In determining the adequacy of the evidence to support the suspension, the suspending official considers how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result. During this assessment, the suspending official may examine the basic documents, including grants, cooperative agreements, loan authorizations, contracts, and other relevant documents.

HUD cited to involved Hodge's "acts and omissions as an officer and principal of Allied Home Mortgage Corporation [ ], a HUD/FHA-approved direct endorsement and lender insurance mortgagee, and Allied Home Mortgage Capital Corporation [ ], a non-supervised loan correspondent mortgagee." *Id.* HUD determined that Hodge knowingly instructed his employees at both companies to violate HUD requirements and caused the submission of false statements to HUD. *Id.* Examples of this conduct were outlined as follows:

> (1)   knowingly permitting individuals to perform quality control reviews who were unqualified;

> (2)   causing statements to be made to HUD with the intent to defraud or deceive HUD regarding the nature of the companies' quality control plans by directing employees to create and submit fraudulent quality control reports;

> (3)   knowingly causing the companies to violate HUD requirements by allowing the creation of "shadow" branches, and allowing branch managers to take on personal liability for branch office leases;

> (4)   knowingly causing false records and statements to be made to HUD in connection with each loan application originated at a "shadow" branch;

> (5)   directing the companies' employees to violate HUD's exclusive employment requirements with respect to selling real estate out of their branch offices; and

---

(b) An indictment, conviction, civil judgment, or other official findings by Federal, State, or local bodies that determine factual and/or legal matters, constitutes adequate evidence for purposes of suspension actions.

(c) In deciding whether immediate action is needed to protect the public interest, the suspending official has wide discretion. For example, the suspending official may infer the necessity for immediate action to protect the public interest either from the nature of the circumstances giving rise to a cause for suspension or from potential business relationships or involvement with a program of the Federal Government.

(6)     causing statements to be made to HUD with the intent to defraud or deceive HUD regarding state sanctions of the companies.

AR 007-009.

HUD found that, in Hodge's past and present position as an officer and principal of Allied Capital and Allied Corp, his actions and conduct were evidence of "serious irresponsibility and [were] cause for debarment under the provisions of 2 C.F.R. §§ 180.800(b) and 180.800(d)."[3] *Id.* at 009.  Hodge was informed of the timing and proper procedures to appeal HUD's decision. *Id.* at 009-010.

---

[3]  The relevant provisions outlining the causes for debarment state as follows:

A Federal agency may debar a person for–

. . .

(b) Violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program, such as--

(1) A willful failure to perform in accordance with the terms of one or more public agreements or transactions;

(2) A history of failure to perform or of unsatisfactory performance of one or more public agreements or transactions; or

(3) A willful violation of a statutory or regulatory provision or requirement applicable to a public agreement or transaction; [or]

. . .

(d) Any other cause of so serious or compelling a nature that it affects your present responsibility.

2 C.F.R. § 180.800.

On the same date, Allied Corp also received Notice of Immediate Suspension of its

HUD/FHA origination and underwriting approvals pursuant to 12 U.S.C. § 1708(c)[4] and Title 24,

Code of Federal Regulations, Part 25.  *Id.* at 001.  Specifically, HUD notified Allied Corp that under

24 C.F.R. § 25.9[5] immediate suspension was warranted based upon adequate evidence of violations

---

[4] The relevant provision of Section 1708 of the United States Code governing Federal Housing Administration operations provides:

When any report, audit, investigation, or other information before the Board discloses that a basis for an administrative action against a mortgagee exists, the Board shall take one of the following administrative actions:

. . .

The Board may issue an order temporarily suspending a mortgagee's approval for doing business with the Federal Housing Administration if (i) there exists adequate evidence of a violation or violations and (ii) continuation of the mortgagee's approval, pending or at the completion of any audit, investigation, or other review, or such administrative or other legal proceedings as may ensue, would not be in the public interest or in the best interests of the Department. Notwithstanding paragraph (4)(A), a suspension shall be effective upon issuance by the Board if the Board determines that there exists adequate evidence that immediate action is required to protect the financial interests of the Department or the public. A suspension shall last for not less than 6 months, and for not longer than 1 year. The Board may extend the suspension for an additional 6 months if it determines the extension is in the public interest. If the Board and the mortgagee agree, these time limits may be extended. During the period of suspension, the Federal Housing Administration shall not commit to insure any mortgage originated by the suspended mortgagee.

12 U.S.C. § 1708(c)(3)(C).

[5] Section 25.9, entitled "Notice of Administrative Action," provides:

(a) Whenever the Board decides to take an action in accordance with 12 U.S.C. 1708(c)(3), the Chairperson of the Board, or the Chairperson's designee, shall issue a written notice of the action to the mortgagee at the mortgagee's address of record of the determination. Proof of delivery to the mortgagee's address of record shall establish the mortgagee's receipt of the notice.

(b) In actions for probation, suspension, or withdrawal, the notice shall describe the nature and duration of the administrative action, and shall specifically state the reasons for the action. In actions for probation, suspension, or withdrawal, the notice shall inform the mortgagee of its right to a hearing regarding the administrative action and of the manner and time in which to request a hearing.

under 24 C.F.R. § 25.6.[6]  *Id.*  HUD alleged the following violations:

    (1)      originating loans from branch offices that were not FHA-approved;

    (2)      submitting false information to HUD regarding the locations where the loans were originated;

    (3)      failing to ensure that the corporate entity paid branch operating expenses;

    (4)      failing to implement a quality control plan;

---

[6]   The relevant violations creating grounds for administrative action implicated by HUD's suspensions include the following provisions of Section 25.6:

Any administrative action imposed under 12 U.S.C. 1708(c) shall be based upon one or more of the following violations:

. . .

(j) Violation of the requirements of any contract or agreement with the Department, or violation of the requirements set forth in any statute, regulation, handbook, mortgagee letter, or other written rule or instruction;

(k) Submission of false information to HUD in connection with any HUD/FHA insured mortgage transaction;

. . .

(n) Employing or retaining:

(1) An officer, partner, director, or principal at such time when such person was suspended, debarred, ineligible, or subject to a limited denial of participation under 2 CFR part 2424 or otherwise prohibited from participation in HUD programs, where the mortgagee knew or should have known of the prohibition;

. . .

(p) Business practices which do not conform to generally accepted practices of prudent mortgagees or which demonstrate irresponsibility; [or]

. . .

(ff) Any other violation of Federal Housing Administration requirements that the Board or the Secretary determines to be so serious as to justify an administrative sanction.

7

(5)     submitting false annual recertifications to HUD for the years 2006-2011 regarding the quality control plan; and

(6)     employing a principal, officer, and director when such person was suspended, namely Jim Hodge for violations including fraud that occurred "with respect to Allied and the related entity Allied Home Mortgage Capital Corporation."

*Id.*

HUD further noted that the United States had filed a lawsuit against Allied Corp, Allied Capital, Jim Hodge, and Jeanne Stell.[7]  *Id.* at 002.  Allied Corp's immediate suspension would be for a temporary period pending the outcome of the United States's lawsuit against Allied Corp and HUD's suspension and debarment actions against Hodge.  *Id.*  The notice also provided that "[b]ecause Allied is one of FHA's largest brokers, Allied's immediate suspension is in the best interest of the Department and the public and is necessary to protect the financial interests of the Department."  *Id.*  Allied Corp was informed of its right to appeal HUD's decision with respect to the suspension.  *Id.*

Instead of appealing the suspensions with the agency, plaintiffs chose to file this civil action under the Administrative Procedures Act seeking a declaration that the suspensions were arbitrary and capricious and should be voided *ab initio*.  Dkt. 1.  Plaintiffs further sought a preliminary injunction, enjoining the enforcement of the suspensions.  Dkt. 2.  A preliminary injunction hearing was held on November 8, 2011 before District Judge Melinda Harmon.  The court granted the preliminary injunction, finding that the plaintiffs had presented a prima facie case of success on the merits because the overwhelming majority of the government's evidence related to Allied Capital

---

[7]  Jeanne Stell was  the former Executive Vice President and Director of Compliance of Allied Corp and Allied Capital.  She is not a party to this action.

and Hodge in his capacity as Allied Capital's President, as opposed to Allied Corp and Hodge in his capacity as President of Allied Corp. Dkt. 37. Specifically, the court found that "HUD's suspension of [Allied] Corp. and Hodge as its CEO, based on successor corporation/continuation doctrine and an improper conflation of the two entities . . . is contrary to Texas law." *Id.* at 20.

Thereafter, HUD rescinded the November suspensions and reissued notices of suspension in May 2012 initiating administrative proceedings and specifying in greater detail the allegations asserted against Allied Corp and Hodge. Dkt. 57, Ex. A. HUD filed a motion to dismiss plaintiffs' claims in light of the rescinded suspensions. Dkt. 56. The court granted HUD's motion to the extent plaintiffs sought injunctive relief and vacated the preliminary injunction as moot, but denied HUD's motion regarding plaintiffs' claim for declaratory relief. Dkt. 65. The court determined that plaintiffs were still subject to a particularized and continuous harm if the suspensions (albeit rescinded) remained on their records with the agency. *Id.* at 14. Both parties now move for summary judgment on plaintiffs' sole remaining claim for declaratory judgment that the November 2011 suspensions should be declared void *ab initio*.

Plaintiffs argue the suspensions were contrary to law because they were based on the incorrect premise that Allied Corp is responsible for the actions or liabilities of Allied Capital. Additionally, plaintiffs maintain that HUD's suspension decision was arbitrary and capricious given the age of the evidence against Hodge and the paucity of evidence directly attributable to Allied Corp. According to plaintiffs, HUD conducted an inadequate investigation, relied on witnesses who lacked credibility, and failed to give plaintiff notice or an opportunity to rebut the allegations. HUD responds that the findings of its independent investigation, in conjunction with the information provided from the S.D.N.Y. Investigation, presented adequate evidence that there was ongoing fraud,

9

under the direction of Hodge, at Allied Capital and Allied Corp warranting immediate suspensions.

The continuous nature of the misconduct evidenced a pattern of fraud by Hodge, and in his position

as President of Allied Corp, as one of HUD's largest lenders, there was an imminent concern that

action was required to protect the financial interests of HUD and the public.

## II.  LEGAL STANDARD

Summary judgment is warranted when the evidence reveals that no genuine dispute exists

regarding any material fact and the moving party is entitled to judgment as a matter of law. FED. R.

CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Triple Tee Golf,*

*Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007).  The summary judgment motion is particularly

appropriate for the review of a decision of a federal administrative agency.  *Girling Health Care, Inc.*

*v. Shalala*, 85 F.3d 211, 214–15 (5th Cir. 1996).

> The explanation for this lies in the relationship between the summary judgment
> standard of no genuine issue as to any material fact and the nature of judicial review
> of administrative decisions . . ..  [T]he administrative agency is the fact finder.
> Judicial review has the function of determining whether the administrative action is
> consistent with the law—that and no more.

*Id.* at 215 (citation omitted).

The Administrative Procedures Act, 5 U.S.C. § 551, *et seq.* ("APA"), allows "[a] person

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action

. . . [to be] entitled to judicial review thereof." 5 U.S.C. § 702.  The scope of judicial review under

the APA is limited, though.  Agency actions are entitled to a presumption of regularity. *U.S. Postal*

*Serv. v. Gregory*, 534 U.S. 1, 10, 122 S. Ct. 431 (2001).  The reviewing court may set aside agency

actions, findings, and conclusions when they are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

To determine whether agency action is arbitrary and capricious, the court must consider whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856 (1983). In reviewing an agency decision, the court may not "substitute its judgment for that of the agency." *Id.*; *La. Envtl. Action Network v. U.S. Envtl. Prot. Agency*, 382 F.3d 575, 582 (5th Cir. 2004). Rather, the court must determine whether the agency considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239 (1962). Deference to agency decision-making, however, does not allow a court to ignore an agency's failure to "consider[ ] . . . relevant factors" or "a clear error of judgment." *State Farm*, 463 U.S. at 43.

## A.     Extra-Record Evidence

As a preliminary matter, HUD objects to the evidence submitted by plaintiffs that was not part of the administrative record. Generally, courts are not permitted to consider evidence outside of the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S. Ct. 1241 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904–05 (5th Cir. 1983). Agency action is to be upheld, if at all, on the basis of the record

11

before the agency at the time it made its decision. *State Farm*, 463 U.S. at 51; *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988).

In limited circumstances, the court can supplement the record with evidence not considered by the agency in making its decision.  Because one question before the court is whether the agency considered all relevant factors, the court can consider extra-record evidence relating to the plaintiffs' allegations that the agency failed to consider all the relevant factors.  *ITT Fed. Services Corp. v. United States*, 45 Fed. Cl. 174, 185 (1999); *Nat'l Audobon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *Shah v. Chertoff*, 2007 WL 2948362, at *6 (N.D. Tex. Oct. 10, 2007).

The extra-record evidence submitted by plaintiffs includes press releases regarding the suspensions of Hodge, Allied Corp and other unrelated mortgagees, the United States's Complaint in Intervention in a *qui tam* action against Allied Capital, transcripts relating to the credibility of Jonathan Fowler and Peter Belli, correspondence from the parties regarding this action, certain emails, and Declarations of Hodge.  Dkts. 90, 99.  While the court may, in limited circumstances, consider evidence outside of the administrative record, the evidence submitted by plaintiffs will not be considered in this case.  The extra-record evidence does not demonstrate that relevant factors were not considered by HUD or include any evidence that HUD was required to review.  The regulations only advise that the agency "*may* examine the basic documents including grants, cooperative agreements, loan authorizations, and contracts, and other relevant documents." 24 C.F.R. § 180.705(a) (emphasis added).  The evidence related to HUD's decision not to suspend other mortgagees is also not relevant to the court's determination whether the suspensions in this case were appropriate.  *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S. Ct. 1649 (1985) (An agency's

decision not to undertake enforcement action "is a decision generally committed to an agency's absolute discretion," and is therefore, presumptively unreviewable.).

The court does not find persuasive plaintiffs' argument that HUD's investigation was conclusory or inadequate or that HUD's findings are suspect because of the lack of credibility of Peter Belli (former Allied Capital branch manager), Jonathan Fowler (former Senior Vice President and Director of Production), and Tony Musgrave (former General Counsel of Allied Capital).   In making a suspension determination, the suspending official considers how much information is available, how credible it is given the circumstances, and whether or not important allegations are corroborated.  24 C.F.R. § 180.705(a).  Here, the S.D.N.Y. Investigation was extensive.  Even if the court were to credit plaintiffs' arguments regarding these individuals' credibility, the S.D.N.Y. Investigation included significantly more than the statements of Fowler, Belli, and Musgrave and revealed that the statements of these individuals were largely corroborated by other witnesses and documents.  Therefore, for purposes of the APA claim, the court will grant HUD's request to strike any evidence submitted by plaintiffs that is not part of the administrative record.

### B.    APA Challenge

Plaintiffs seek a declaration that, as a matter of law, HUD improperly suspended the authority of plaintiffs to originate FHA-insured mortgage loans, and that such suspensions should be declared void *ab initio*.  Plaintiffs argue that HUD acted contrary to applicable law and arbitrarily and capriciously because HUD failed to follow its own standards for issuing immediate suspensions. Specifically, HUD did not have adequate evidence of any present or imminent threat to the financial interests of the public or HUD such that immediate suspensions were warranted.

13

The issuance of a suspension is "a serious action," and thus, may only be imposed when "adequate evidence" exists to suspect a violation listed in 24 C.F.R. § 180.800,[8] and "[i]mmediate action is necessary to protect the public interest."  24 C.F.R. § 180.700.  "Adequate evidence" is defined as "[i]nformation sufficient to support the reasonable belief that a particular act or omission has occurred." 2 C.F.R. § 25.3.  The "adequate evidence" standard has been likened to the probable cause standard applicable in a criminal case for an arrest or search warrant.  *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972).  It is "less than [what] must be shown at the [criminal] trial, but it must be more than uncorroborated suspicion or accusation."  *Id.*  "In determining the adequacy of the evidence to support the suspension, the suspending official considers how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result."  24 C.F.R. § 180.705(a).

The Mortgagee Review Board may take immediate suspension action without having previously issued a notice of violation, if the Board determines "that there exists adequate evidence that immediate action is required to protect the financial interests of the Department or the public." 12 U.S.C. § 1708(c); 2 C.F.R. § 25.7.  In determining whether administrative action should be taken under Section 1708(c), the Mortgagee Review Board considers, "among other factors, the seriousness and extent of the violations, the degree of mortgagee responsibility for the occurrences, and any other mitigating or aggravating factors."  *Id.* at § 25.8.  "In deciding whether immediate action is needed to protect the public interest, the suspending official has wide discretion.  For example, the suspending official may infer the necessity for immediate action to protect the public

---

[8]  *See* footnote 3 *supra*.

14

interest either from the nature of the circumstances giving rise to a cause for suspension or from potential business relationships or involvement with a program of the Federal Government."  24 C.F.R. § 180.705(c).

       *i.*     *Adequate Evidence - Hodge*

Hodge was the President of Allied Capital and President of Allied Corp during all periods relevant to this matter.  He is currently the Chairman of the Board of Allied Corp.  AR 053.  During his tenure as President of Allied Capital, HUD considered significant evidence dating back over a decade that demonstrates that Hodge continuously and knowingly violated HUD regulations.[9]  In late 2010, he continued the same operations at Allied Corp in contravention of HUD regulations.

The Complaint in the S.D.N.Y. civil fraud case, Michael Milner's Declaration,[10] and the Notice of Suspension and Proposed Debarment document the litany of HUD violations committed at Allied Capital and Allied Corp under the leadership of Hodge.  First, HUD attained evidence that Hodge, as President of Allied Capital and Allied Corp, sanctioned the establishment of hundreds of "shadow" branches, which were not approved by HUD.  Dkt. 83, ¶¶16-31; AR 057-062.  These unauthorized branches originated hundreds, if not thousands of loans.  *Id.*  Based upon a comparison of HUD records and Allied Capital's branch lists, Allied Capital operated 2200 branches, but only 640 were approved by HUD to originate FHA-insured loans.  Dkt. 83, ¶16.  Numerous witnesses also

---

[9]  While the court agrees with Judge Harmon's analysis regarding successor liability as it relates to Allied Corp, it does not agree that Hodge cannot be held responsible for his actions as President at Allied Capital and Allied Corp when he, individually, is facing suspension and debarment.

[10]  Michael Milner is a Trial Attorney for the Administrative Proceedings Division in the Office of General Counsel, Office of Program Enforcement at HUD.  Milner was involved in drafting the suspensions at issue and compiling the administrative record, including all documents directly and indirectly considered by HUD decision-makers in reaching their decisions.  Dkt. 83 at 1-2.

confirmed that this practice regularly occurred and was directly endorsed by Hodge. *Id.* at ¶24. In August 2006, HUD issued a Mortgagee Letter clearly prohibiting the origination of loans out of "satellite offices." AR 368. Despite the clear directive of HUD prohibiting this practice, both Allied companies continued this practice at least through October 2011. Dkt. 83, ¶72. In turn, this practice also resulted in the submission of hundreds of false statements to HUD when loans were originated at "shadow" branches using the "borrowed" HUD identification numbers of approved branches. *Id.* at ¶¶32-33.

Additionally, the S.D.N.Y. Investigation revealed, and HUD determined, that Allied Capital and Allied Corp, under the direction of Hodge, failed to comply with HUD regulations requiring the corporate entities to pay all branch operating costs. AR 061-069. According to HUD rules, a mortgagee must assume financial responsibility for all approved branch offices, and the mortgagee must certify that it has complied with this HUD requirement. Dkt. 83, ¶35; AR 0670-0671. Since 2001, Allied Capital has routinely failed to pay branch operating costs, including paying managers on commission, requiring managers to enter into leases in their individual capacities, and obligating managers to pay legal judgments. Dkt. 83, ¶¶37-45. This practice continued under the leadership of Hodge as late as January 2011, when Allied Corp failed to pay branch lease obligations and paid the branch manager on a commission basis. *Id.* at ¶44. This practice, likewise, led to false reporting because the mortgagee is required to certify to HUD that it has satisfied this obligation. *Id.* at ¶45.

Allied Capital also did not maintain an adequate quality control plan and deceived HUD in its certifications regarding the status and implementation of an approved quality control program. AR 069-071. Specifically, Allied Capital failed to conduct on-site branch audits, and completely discontinued audits per the instructions of Hodge in 2008. Dkt. 83, ¶48. In 2008, Allied Capital had

16

more than 600 active branches and only two quality control staff members. *Id.* at ¶52. Evidence also revealed that many of the quality control tasks were outsourced to a company owned by Hodge in St. Croix, U.S. Virgin Islands, where the employees had little or no mortgage experience, in violation of HUD quality control standards. *Id.* at ¶50. As corroborated by at least two witnesses, Hodge directed his quality control staff to falsify information in quality control reports to make them appear current. *Id.* at ¶53-54; AR 071. HUD further cited to and relied upon evidence that violations occurred under Hodge related to the reporting of state sanctions to HUD on an annual basis from 2004-2009, Dkt. 83, ¶56; AR 071-074, and directing branch managers to sell real estate out of their branch offices. Dkt. 83, ¶40.

The evidence before the decision-makers at HUD was overwhelming against Hodge and documented a pattern and practice of multiple violations, many of which were directly endorsed and encouraged by Hodge. Given the extent of the evidence and continuous nature of the violations by Hodge, the court finds that HUD's decision to immediately suspend Hodge and propose debarment was not arbitrary or capricious.

### ii.    *Adequate Evidence - Allied Corp*

The court discounts the violations cited by HUD for Allied Corp's suspension based on conduct occurring before late 2010 when Allied Corp took over the operations of certain Allied Capital branches. Namely, HUD appears to have no evidence of violations cited in numbers 4 and 5 of the Notice of Suspension to Allied Corp related to the quality control program. The court also discounts violation number 6 in the notice because the Notice of Suspension was issued on the same day as Hodge's Notice of Suspension and Proposed Debarment. HUD regulations prohibit a mortgagee from employing an officer or principal who has been suspended or debarred or is subject

17

to unresolved findings of a government investigation. 24 C.F.R. § 25.6(n)(1). However, such regulation only makes this conduct a violation "where the mortgagee knew or should have known of the prohibition." *Id.* Here, Allied Corp could not have known that Hodge was the subject of suspension, debarment, or unresolved findings when Allied Corp received its notice of suspension simultaneously with that of Hodge. Therefore, the court will consider only the evidence directly attributable to Allied Corp relating to the violations cited in numbers 1, 2, and 3 of the Notice of Suspension.

While the adequacy of the evidence in support of Allied Corp's immediate suspension is a closer call, the court finds that there existed sufficient proof to support a "reasonable belief" that violations had occurred at Allied Corp greater than mere uncorroborated suspicion or accusation. *See* 2 C.F.R. § 25.3; *Horne Bros.*, 463 F.2d at 1271. Specifically, in January 2011, Allied Corp violated HUD's rules regarding payment of branch operating expenses by paying a branch manager commission only and requiring a branch manager to remain liable on a lease she entered into in her individual capacity when Allied Corp decided to close the branch. Dkt. 83, ¶44; AR 068. The S.D.N.Y. Investigation also revealed that Allied Corp was operating "shadow" branches as recently as October 2011. Dkt. 83, ¶72.

As noted, the court cannot "substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and HUD has wide discretion in deciding whether to take immediate action in the interest of the public or the Department. 24 C.F.R. § 180.705(c). HUD also was permitted to draw inferences in support of immediate action based on the nature of the circumstances giving rise to a cause for suspension. *Id.* HUD had before it evidence of recent violations committed by Allied Corp and a history of violations committed by its President. The role and involvement of Hodge in

the operations of Allied Corp clearly supported an inference that Allied Corp would be operated (and was being operated) in the same manner as Allied Capital.  The court finds that a rational connection exists between the choice made by HUD and the factual circumstances underlying the suspension of Allied Corp.

       *iii.*    *Immediate Action*

Plaintiffs argue that immediate suspensions were unwarranted because there was no evidence that plaintiffs posed any present threats, but rather, all the evidence relied upon by HUD was outdated.  Certain evidence, however, belies plaintiffs' argument.  Evidence gathered during the S.D.N.Y. Investigation revealed that Allied Corp continued the practices of Allied Capital with respect to its failure to pay branch operating expenses and operating "shadow" branches as recent as October 2011.  The circumstances surrounding the nature of the violations supported HUD's immediate action.  Specifically, Allied Corp conducted a high volume of FHA business.  As noted in Milner's Declaration, HUD had heightened concerns regarding the continued operation of "shadow" branches because the operation of "shadow" branches by Allied Capital has resulted in at least $150 million loss to the FHA insurance program.  Dkt. 83, ¶76.  HUD drew rational inferences based on the severity, persistence, and length of the misconduct at Allied Capital, and the evidence that the misconduct was continuing under the direction of Hodge at Allied Corp.

Plaintiffs rely heavily on *Sloan v. Dep't of Housing & Urban Dev.*, 231 F.3d 10 (D.C. Cir. 2000) to support their arguments regarding the adequacy of the evidence and the necessity of immediate action.  In *Sloan*, appellants filed a similar action seeking to void their suspensions *ab initio*.  *Sloan*, 231 F.3d at 11.  HUD originally proposed debarment of appellants from government contracting based on allegations of improper clean-up and disposal of waste at a public housing

construction site and issued suspensions pending the outcome of the debarment proceeding. *Id.* Appellants appealed the decision to the Administrative Law Judge, who denied the debarment and terminated the suspensions, but declined to void the suspensions *ab initio*. *Id.* Appellants argued HUD's refusal to void their suspension *ab initio* was arbitrary and capricious because two of the grounds upon which HUD relied for the suspensions were unsupported by the evidence and the final ground HUD conceded would not, alone, support a suspension. *Id.* On this record, the Circuit Court concluded that the agency's failure to void the suspensions *ab initio* was arbitrary and capricious. *Id.* at 17.

The case here, however, is readily distinguishable from *Sloan*. First, HUD stands by its grounds for suspension and has evidence showing that actual violations were committed by Hodge and Allied Corp. Further, the only supported ground for suspension in *Sloan* regarding disposal of debris in an unapproved landfill was determined to have ceased before the issuance of the suspensions. *Id.* On that basis, the court concluded there was no "present responsibility" when the suspensions were issued. *Id.* The discrete acts upon which the *Sloan* suspensions were based indisputably had ceased before the suspensions were issued, and the appellants had, ultimately, been absolved of all wrongdoing by the completion of the ALJ hearing. *Id.* That is simply not the case here. HUD considered and relied upon evidence of continuous, persistent, and ongoing violations when it issued notices of suspension to Hodge and Allied Corp.

Moreover, there is no bright line rule dictating that HUD must take action within a certain time period of the violation. Rather, HUD is granted discretion to consider all the evidence and circumstances before it in determining the proper action necessary to protect the interests of the agency and the public. The delay in issuing the suspensions was also justified by the ongoing

20

S.D.N.Y. Investigation, which resulted in a civil fraud complaint being filed just seven days before the issuance of the suspensions. *See Neil Laboratories, Inc. v. Ashcroft*, 217 F. Supp. 2d 80, 87 (D.C. Cir. 2002) (noting "the DEA's six-month delay in issuing the suspension order to Neil Labs [was] justified by its ongoing criminal investigation"). Therefore, the court does not agree that there is inadequate evidence supporting plaintiffs' immediate suspensions or that the historical events relied upon by HUD make its decision any less rational.

### C.      Due Process Claim

Finally, plaintiffs claim that the suspensions violated their substantive and procedural due process rights under the Fifth Amendment. They cite to loss of Allied Corp's goodwill and damage to Hodge's professional reputation and business relationship with the government as the protected interests at stake. Plaintiffs maintain that such interests were violated when HUD failed to give them notice of the suspensions and an opportunity to respond. Further, plaintiffs assert that HUD acted arbitrarily and capriciously in issuing the suspensions and made defamatory statements in the press releases related thereto. HUD responds that its suspensions were not issued arbitrarily or capriciously and that plaintiffs were provided post-suspension procedural rights consistent with the applicable regulations. The parties dispute whether goodwill and reputation constitute protectible liberty or property interests. However, the court need not make such determination in this case because, even assuming such interests were protected for purposes of due process, the court finds that plaintiffs were not denied substantive or procedural due process under the law.

To establish a substantive due process violation, a plaintiff must show that the government deprived him of a constitutionally protected interest arbitrarily and capriciously. *Simi Inv. Co., Inc. v. Harris County, Tex.*, 236 F.3d 240, 249 (5th Cir. 2000). Government action will comport with

21

substantive due process if the action is "rationally related to a legitimate governmental interest." *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996).  Based on the court's previous finding that HUD did not act arbitrarily and capriciously in relation to the suspensions of Allied Corp or Hodge, plaintiffs' substantive due process claim fails.  HUD had adequate evidence warranting the immediate suspensions of plaintiffs in order to protect the financial interests of HUD and the public.

To establish a procedural due process violation, a plaintiff must show that the government deprived him of a protected property interest without due process.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S. Ct. 1148 (1982).  Here, plaintiffs have not made any allegations that HUD's post-deprivation procedures were constitutionally inadequate.  Rather, plaintiffs argue that they were not given an opportunity before the suspension to respond to the allegations.  As a general rule, due process does not always require pre-deprivation procedural protection.  *Barry v. Barchi*, 443 U.S. 55, 65, 99 S. Ct. 2642 (1979) (pending prompt judicial or administrative hearing to determine issue, state's board could properly temporarily suspend horse trainer's license prior to hearing).  The time and manner in which procedural safeguards must be invoked varies with "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."  *Logan*, 455 U.S. at 434; *Cafeteria and Rest. Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S. Ct. 1743 (1961).

In this case, HUD imposed immediate and temporary suspensions to protect the financial interests of the Department and public in light of the ongoing violations of HUD regulations and the operations of "shadow" branches, which by their nature, remained concealed from HUD.  Neither suspension of Hodge nor Allied Corp was final.  Hodge's suspension would remain in effect until

22

the completion of the debarment proceedings, while Allied Corp was suspended pending the completion of the debarment proceeding of Hodge and the United States's civil fraud action against Allied Corp.  Plaintiffs were each advised that they could contest HUD's decision by requesting a hearing within 30 days of the notice under the applicable statutes and regulations.  12 U.S.C. § 1708(c); 2 C.F.R. §§ 180.725, 180.820; 24 C.F.R. §§ 25.9, 25.10(a).  Further, a hearing had to be held within 30 days of the mortgagee's request for a hearing, unless it requested an extension of time. 12 U.S.C. § 1708(c)(4)(B); 24 C.F.R. § 25.10(b).  While there is no question that the suspensions impacted plaintiffs' business and temporarily terminated its ability to originate FHA loans, HUD is authorized to take immediate action and provide for post-suspension appeals procedure based on the important governmental interests at stake.  The court finds support for this decision in other cases which have subordinated more substantial property interests to the government's interest in protecting the public.  *Sloan*, 231 F.3d at 18 (finding post-suspension procedures adequately safeguarded plaintiffs' due process rights); *Schwartz v. U.S. Dep't of Labor*, 161 Fed. Appx. 357, 358-59 (5th Cir. 2005).  Balancing the relevant considerations, the court concludes that HUD's notice and provision of the full panoply of post-suspension procedural rights did not violate plaintiffs' due process rights.

Defamatory statements can also result in a violation of due process where such statements asserting serious wrongdoing by plaintiff are false and deprive plaintiff of a protected interest. *Vander Zee v. Reno*, 73 F.3d 1365, 1369 (5th Cir. 1996).  The Supreme Court held that injury to reputation alone, however, is not sufficient to implicate due process, but the injury must be coupled with the infringement of a more tangible interest.  *Paul v. Davis*, 424 U.S. 693, 710-11, 96 S. Ct. 1155 (1976).  The standard set out in *Paul* has been coined the "stigma plus infringement" test.

23

*Blackburn v. City of Marshall*, 42 F.3d 925, 935-36 (5th Cir. 1995); *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1215 (5th Cir. 1989). To fulfill the stigma prong of the test, "the plaintiff must prove that the stigma was caused by a false communication." *Phillips v. Vandygriff*, 711 F.2d 1217, 1221 (5th Cir. 1983) (citing *Codd v. Velger*, 429 U.S. 624, 97 S. Ct. 882 (1977)). Sufficient stigma is only asserted where the government has made a "concrete, false assertion[ ] of wrongdoing on the part of the plaintiff." *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701 (5th Cir. 1991). To show infringement, a plaintiff must establish that the state sought to remove or significantly alter a life, liberty, or property interest recognized and protected by state law or guaranteed by one of the provisions of the Bill of Rights. *Id.* at 701-02.

The plaintiffs' procedural due process claim fails to satisfy the stigma portion of the test set out in *Paul*. First, the actual defamatory statements referenced by plaintiffs are included the press releases. *See e.g.*, Dkt. 99 at 28 ("The Suspension . . ., coupled with the defamatory press releases, similarly caused significant harm . . .."). Plaintiffs have not shown how the notices of suspension, as opposed to the actual suspension or civil fraud claims, removed or significantly altered a protected interest. More importantly, though, plaintiffs have not shown that the statements contained within the suspension notices were false. Thus, plaintiffs have not established a genuine issue of material fact concerning a due process violation.

## IV. CONCLUSION

After consideration of the arguments and the record, the court finds that HUD's suspensions of James Hodge and Allied Corp were not arbitrary and capricious.  Plaintiffs have also failed to make a case for any due process violation.  Therefore, plaintiffs' motion for summary judgment (Dkt. 89) is DENIED and defendants' motion for summary judgment (Dkt. 91) is GRANTED.  Plaintiffs' claims against defendants are DISMISSED WITH PREJUDICE.  The court will enter a separate final judgment in accordance with this opinion.

It is so ORDERED.

Signed at Houston, Texas on August 5, 2014.

Gray H. Miller
United States District Judge

25